2002 OK 60

Steve and Violet MYERS, individually and on behalf of the Estate of Lesa Myers, Respondents/Appellants,

v.

MISSOURI PACIFIC RAILROAD COMPANY, d/b/a Union Pacific Railroad Company, and/or Union Pacific Railroad Company and Jim Q. Collins, Petitioners/Appellees.

No. 93,313.

Supreme Court of Oklahoma.

July 2, 2002.

THE COURT OF CIVIL APPEALS' OPINION IS VACATED; THE JUDGMENT OF THE TRIAL COURT IS AFFIRMED.

Roy Dickinson, Norman, OK, for Appellants.

Tom L. Armstrong and Robert D. Hart, Gibbs Armstrong Harmon Borochoff Calvert & Mullican, Tulsa, OK, for Appellees.

OPALA, J.

¶ 1 The dispositive issues tendered on certiorari are (1) does federal law preempt plaintiffs' state-tort-law theory that the railroad provided inadequate warning devices at the grade crossing in question? and (2) does federal law preempt plaintiffs' state-tort-law theory that the train was traveling at an excessive speed at the time of the collision? We answer both of these questions in the affirmative and then consider other questions that, though raised by plaintiffs' appeal, were left undecided by the intermediate appellate court's opinion.

## I

## ANATOMY OF LITIGATION

¶ 2 In the late afternoon of 20 February 1995 four teenage girls got into a pickup truck in Apache, Oklahoma and began a short journey that would end in injury and death. Traveling west on Highway 19, the pickup truck struck the lead car of a northbound train owned by the Union Pacific Railroad Company (the "railroad") and operated that day by engineer, Jim Q. Collins (collectively "defendants"). The driver of the pickup, Raewynn Gilmore ("Gilmore") and passenger Lesa Myers were killed. Two other passengers were injured but survived.

¶ 3 On 18 February 1997 Lesa Myers' parents, Steve and Violet Myers ("plaintiffs"), brought a wrongful death action against defendants in the District Court, Caddo County, in which they sought compensatory and punitive damages for their daughter's death. They alleged *inter alia* that defendants were negligent in (1) failing to equip the Highway 19 crossing with adequate warning devices, (2) traveling at an excessive speed, (3) failing to reduce the train's speed in sufficient time to avoid the accident, (4) failing to maintain the crossing's warning devices in proper working order, and (5) failing to adequately sound the train's whistle. In their quest for punitive damages, plaintiffs alleged that the defendants' acts and omissions evidenced a wilful, wanton, and reckless disregard for the safety of the public.

¶ 4 On 10 August 1998 defendants moved for summary judgment on the grounds that Gilmore's failure to stop for the flashing lights at the crossing constituted negligence *per se* and was the proximate cause of the collision.[1] The trial court ruled that material fact issues remained in dispute and denied the motion.

¶ 5 On 16 March 1999 defendants sought summary adjudication of plaintiffs' claim in-

---

1. The provisions of 47 O.S.2001 § 11–701(a) require a driver to stop at least fifteen (15) feet from a railroad crossing when "a clearly visible electric or mechanical signal device gives warning of the immediate approach of a railroad train; ..."

sofar as it based negligence liability on (1) the inadequacy of the crossing's warning devices, (2) the unreasonableness of the train's speed, and (3) the inadequacy of the locomotive's warning devices. Defendants argued that each of these theories was preempted by federal law. *Plaintiffs conceded the motion insofar as it asserted the inadequacy of the locomotive's warning devices, and the trial court ruled that federal law did indeed preempt the other two theories.*

¶6 In April/May 1999 the case was tried to a jury, which returned a verdict for defendants. Judgment was entered on the verdict and plaintiffs appealed, assigning as error the trial court's pretrial summary rulings regarding federal preemption, certain of its evidentiary rulings at trial, and several of its decisions to give or refuse to give instructions to the jury.[2] Defendants urged in their response review of error in the trial court's denial of their 10 August 1998 motion for summary judgment.

¶7 The Court of Civil Appeals, Division II (COCA), reversed the judgment, holding that the trial court's speed preemption ruling was overbroad, preventing plaintiffs from presenting non-preempted theories of recovery. COCA concluded that preemption does not bar proof, including that of the train's actual speed, that the railroad failed "to operate its train safely, with due regard for the locale and other conditions within its knowledge."

¶8 We granted certiorari on defendants' petition and now vacate COCA's opinion. Because COCA viewed the question of speed preemption as dispositive, it left unaddressed certain of plaintiffs' other assignments of error. We must hence treat those issues as undecided in the *Hough v. Leonard*[3] sense. Having now reviewed all issues properly preserved and presented for appellate review, we affirm the *nisi prius* judgment.

## II

## STANDARD OF REVIEW FOR SUMMARY PROCESS

¶9 Summary process is a procedural pretrial device for the prompt and efficient disposition of an action *sans* forensic combat. It is applied where neither the material facts nor any inferences that may be drawn from undisputed facts are in dispute, and the law favors the movant's claim or liability-defeating defense.[4] It is not the purpose of summary process to substitute a trial by affidavit for one by jury. Rather, its goal is to afford a method of summarily terminating a case (or eliminating from trial some of its issues on the merits of a claim or defense) where only questions of law remain.[5] Summary relief issues stand before us for *de novo* review in which this court's scrutiny of the entire record is pursued independently and without deference to the trial court's resolution.[6]

2. Specifically, plaintiffs challenge the following *nisi prius* rulings: (1) that federal law preempts evidence of the need for additional warning devices; (2) that federal law preempts evidence that the train was traveling at an excessive speed; (3) refusing to instruct the jury regarding certain statutory duties imposed on railroads by Oklahoma law; (4) instructing the jury that a train has an unconditional right-of-way at grade crossings; (5) refusing to instruct the jury on the criteria for determining whether a crossing is ultrahazardous and on a railroad's duty to maintain adequate warning devices at ultrahazardous crossings; (6) refusing to instruct the jury that damages liability may be apportioned among the defendants *and* negligent persons who are not parties to the lawsuit; (7) excluding evidence of the railroad's policy of ignoring extra-hazardous crossings and of neglecting safety issues posed by those crossings; and (8) excluding evidence that the railroad benefited financially from cutbacks

in the maintenance of its crossings and the training of maintenance personnel.

3. 1993 OK 112, 867 P.2d 438. *Hough* teaches that the party victorious in COCA is entitled to our *sua sponte* review of all issues which, though properly preserved and briefed on appeal, were not addressed by the intermediate appellate court. *Id.* at ¶15, at 445.

4. *Manley v. Brown*, 1999 OK 79, ¶22, 989 P.2d 448, 455–56.

5. *Russell v. Bd. of County Comm'rs*, 1997 OK 80, ¶7, 952 P.2d 492, 497; *Gray v. Holman*, 1995 OK 118, ¶11, 909 P.2d 776, 781.

6. *Mahan v. NTC of America*, 1992 OK 8, ¶2, 832 P.2d 805, 808 (Opala, C.J., concurring) (*"The de novo standard of review is utterly nondeferential because it ascribes absolutely no weight to a lower tribunal's findings."*). An order that grants sum-

## III

### PLAINTIFFS' INADEQUATE WARNING DEVICE THEORY OF LIABILITY IS PREEMPTED BY FEDERAL LAW [7]

[6] ¶ 10 Congress in 1970 enacted the Federal Railroad Safety Act (the "FRSA").[8] Its stated purpose is "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." [9] It authorizes the Secretary of Transportation (the "Secretary") to "prescribe regulations and issue orders for every area of railroad safety." [10] Until the Secretary adopts a rule, regulation, order or standard covering the subject matter of a particular state safety requirement, the FRSA permits states to adopt or continue in force their own laws regulating that safety issue.[11] Once the Secretary promulgates regulations or issues an order covering the subject matter of a particular safety requirement, the provisions of 49 U.S.C. § 20106 preempt most state laws purporting to regulate the same safety concern.[12]

¶ 11 The Secretary issued federal regulations in 1973 covering the adequacy of warning devices at grade crossings.[13] The United

---

mary relief, in whole or in part, disposes solely of law questions. It is hence reviewable by a *de novo* standard. *Brown v. Nicholson*, 1997 OK 32, ¶ 5, 935 P.2d 319, 321; *Kluver v. Weatherford Hosp. Auth.*, 1993 OK 85, ¶ 14, 859 P.2d 1081, 1083 ("Issues of law are reviewable by a *de novo* standard and an appellate court claims for itself plenary independent and non-deferential authority to re-examine a trial court's legal rulings."); *Salve Regina College v. Russell*, 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).

**7.** The question of whether the plaintiffs' warning device theory is preempted by federal law *was not left unaddressed* by COCA, but was in fact decided adversely to plaintiffs. Because plaintiffs "won" in the COCA, they did not file a certiorari petition, but did re-press the warning device issue in their certiorari brief. *Cf. Markwell v. Whinery's Real Estate, Inc.*, 1994 OK 24, ¶ 8, 869 P.2d 840, 843 ("The filing of a timely brief amends deficiencies, if any, of the petition in error."). Even without its own certiorari petition, the successful party can advance any arguments which would demonstrate the correctness of COCA's disposition. *May–Li Barki, M.D. v. Liberty Bank & Trust Co.*, 1999 OK 87, ¶ 8, 20 P.3d 135, 144.

**8.** The FRSA was originally codified at 45 U.S.C. § 421 *et seq.* Those sections were repealed in 1994 and the FRSA is now recodified at 49 U.S.C. § 20101 *et seq.*

**9.** *See* the terms of 49 U.S.C. § 20101 which state:

"The purpose of this chapter is to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents."

**10.** *See* the provisions of 49 U.S.C. § 20103(a), which state:

"The Secretary of Transportation, as necessary, shall prescribe regulations and issue orders for every area of railroad safety supplementing laws and regulations in effect on October 16, 1970."

**11.** The provisions of 49 U.S.C. § 20106 state in pertinent part:

"Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement...."

**12.** The provisions of 49 U.S.C. § 20106 contemplate a continuing but narrowly circumscribed role for state regulation:

"A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation, or order—
(1) is necessary to eliminate or reduce an essentially local safety hazard;
(2) is not incompatible with a law, regulation, or order of the United States Government; and
(3) does not unreasonably burden interstate commerce."

**13.** The regulations covering grade crossing warning devices are found at 23 CFR § 646.214(b)(3) and (b)(4). They provide in pertinent part:

"(3)(i) Adequate warning devices under § 646.214(b)(2) [railroad-highway grade crossing located within the limits of or near the terminus of a Federal-aid highway project for construction of a new highway or improvement of an existing roadway] or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:
(A) Multiple main line railroad tracks.
(B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.
(C) High Speed train operation combined with limited sight distance at either single or multiple track crossings.

States Supreme Court held in *CSX Transportation., Inc. v. Easterwood*[14] that where these regulations "are applicable" and federal funds participate in the installation of warning devices, state tort law imposing different requirements is preempted.[15] The Supreme Court recently elaborated on the scope of this federal preemption in *Norfolk Southern Railway Company v. Shanklin,*[16] holding that the federal protective device regulations do not depend for their applicability on "an individualized determination of adequacy" by a diagnostic team or by federal officials,[17] but rather " 'are applicable' to all warning devices actually installed with federal funds."[18]

¶ 12 Plaintiffs alleged that defendants were negligent for having provided inadequate warning devices at the Highway 19 crossing. Defendants moved for summary adjudication of that theory on the grounds that it was preempted by the federal warning device regulations. In support of their motion, defendants tendered a copy of a contract between the railroad's predecessor and the State of Oklahoma dated 30 January 1962, which provides for the installation of an "Automatic Grade Crossing Protective Device" at the Highway 19 crossing. The contract states that the project was to be financed with federal funds provided through the Federal Aid Program. Defendants also tendered an affidavit from the railroad's Director of

Public Projects, Cliff Shoemaker, confirming that federal money was in fact expended and comprised 90% (ninety percent) of the funds for the project.

¶ 13 Plaintiffs did not dispute the 1962 participation of federal money in installing the existing warning devices, but argued that the use of federal money in 1962 could not give rise to federal preemption under the FRSA because that legislation was not enacted until eight years after the expenditure of federal funds at the Highway 19 crossing. The trial court disagreed and ruled that plaintiffs' inadequate warning device theory was preempted.

¶ 14 On the morning the trial of this cause was set to begin, defendants presented to the court a number of newly discovered documents showing that the Highway 19 crossing's protective devices had again been upgraded using federal funds *in 1987*. Defendants did not ask leave of court to supplement the summary adjudication record with these documents, but simply announced their existence and provided copies of them to the court and opposing counsel. Defendants did not request a revised preemption ruling to take into account the additional evidentiary material.

¶ 15 Plaintiffs reacted to defendants' eleventh-hour production of the documents by

---

(D) A combination of high speeds and moderately high volumes of highway and railroad traffic.

(E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of school buses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.

(F) A diagnostic team recommends them.

(ii) In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA [Federal Highway Administration] may find that the above requirements are not applicable.

* * *

(b)(4) For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA."

**14.** 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993)

**15.** *Id.* at 671, 507 U.S. 658, 113 S.Ct. 1732 at 1741, 123 L.Ed.2d 387 ("In short, for projects in which federal funds participate in the installation of warning devices, the Secretary has determined the devices to be installed and the means by which railroads are to participate in their selection. The Secretary's regulations therefore cover the subject matter of state law which, like the tort law on which respondent relies, seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings.").

**16.** 529 U.S. 344, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000).

**17.** *Id.* at 356, 120 S.Ct. at 1475.

**18.** *Id.* at 357, 120 S.Ct. at 1476 ("When the FHWA [Federal Highway Administration] approves a crossing improvement project and the State installs the warning devices using federal funds, §§ 646.214(b)(3) and (4) establish a federal standard for the adequacy of those devices that displaces state tort law addressing the same subject.").

asking the trial court to sanction defendants, but did not specifically object to the trial judge taking them into consideration nor make a motion to strike or for a continuance.[19] In fact, plaintiffs' counsel stated on the record more than once that the documents provided proof of post-FRSA funding. Plaintiffs nevertheless argued (two years before the Supreme Court in *Shanklin* held to the contrary) that the 1987 documents actually proved that preemption was inapplicable because they lacked a specific, written determination by a diagnostic team that gates were not necessary at the Highway 19 crossing. Plaintiffs then moved the trial court to reverse its earlier preemption ruling. *The trial judge refused.* Plaintiffs subsequently re-pressed this argument in writing and tendered the 1987 documents to the trial court in support of their offers of proof. The documents were later made part of the appellate record by plaintiffs' designation.

¶ 16 Plaintiffs urge this court to reverse the *nisi prius* preemption ruling on the grounds that the only evidentiary material properly before the trial court in making its summary ruling was that pertaining to the 1962 upgrade of the Highway 19 crossing. Pre–FRSA federal funding, plaintiffs argue, does not support preemption. Plaintiffs contend that even if the 1987 documents do in fact show post-FRSA federal funding, a matter plaintiffs now deny, they are beyond this court's reviewing cognizance because they were never properly made part of the summary process record. While we agree with plaintiffs that the 1962 federal funding would not support preemption, *we disagree that the 1987 documents are beyond our power to consider on review.*

 ¶ 17 A summary disposition of fewer than all issues in a cause is simply a judicial pretrial designation of those issues which are to be treated as resolved.[20] It is neither a "final judgment" nor a final order, but a provisional remedy whose interlocutory character makes it subject to alteration or modification by the trial court at any time prior to entry of judgment in the case.[21] Re-examination of a summary disposition is always within the trial court's discretion and may be effected at any stage of the proceeding when it appears that the earlier disposition was in error.

 ¶ 18 Ordinarily, an appellate court will not take notice on review of any material that was not properly before the trial court in the decisional process that led to summary judgment.[22] We must hence consider whether the 1987 documents were properly before the trial judge in this case. The provisions of District Court Rule 13, the rule governing summary judgments, provide in part:

> "A party may move for judgment in his favor on the ground that the depositions, admissions in the pleadings, stipulations, answers to interrogatories and to requests for admissions, affidavits, and exhibits *on file, filed with his motion or subsequently filed with leave of court* show that there is no substantial controversy as to any material fact . . . ." [23] (emphasis added)

The 1987 documents were not presented to the trial court in conformity with the procedure set forth in Rule 13. Nevertheless, they were placed before the trial court in the decisional process leading to summary judgment. The filing requirement contained in Rule 13 is for the benefit of nonmovants so that they may have an opportunity to respond. It may be waived.[24] In this case plaintiffs not only did not explicitly object to the consideration of the 1987 documents, but

---

19. For a procedural rule that requires objectionable evidentiary material to be challenged, *see Seitsinger v. Dockum Pontiac Inc.*, 1995 OK 29, ¶ 14, 894 P.2d 1077, 1080.

20. *Reams v. Tulsa Cable Television, Inc.*, 1979 OK 171, ¶ 4, 604 P.2d 373, 375.

21. *Id.* at ¶ 6, at 376.

22. *Hadnot v. Shaw*, 1992 OK 21, ¶ 8, 826 P.2d 978, 982; *Hulsey v. Mid–America Preferred Ins.* Co., 1989 OK 107, ¶ 7, 777 P.2d 932, 936; *Frey v. Independence Fire and Cas. Co.*, 1985 OK 25, ¶ 6, 698 P.2d 17, 20; *Ross v. City of Shawnee*, 1984 OK 43, ¶ 8, 683 P.2d 535, 536.

23. Rule 13, Rules for the District Courts of Oklahoma, 12 O.S.2001, Ch.2 App.

24. *Cf. Towne v. Hubbard*, 2000 OK 30, ¶ 18, 3 P.3d 154, 162 (holding that lack of timely notice may be waived by participating in a proceeding without objecting or asking for a continuance).

they themselves used the documents in arguing for a reversal of the court's earlier ruling. Moreover, having themselves placed the documents in the record on appeal, plaintiffs cannot now be heard to complain because we treat them as part of that record. Summary relief issues stand before us for *de novo* review in which this court's scrutiny of the *entire record* is pursued independently and without deference to the trial court's resolution.[25] That record includes the 1987 documents. *Preemption was clearly the defendants' due.*

## IV

## PLAINTIFFS' EXCESSIVE SPEED AND KINDRED THEORIES OF LIABILITY ARE PREEMPTED BY FEDERAL LAW

¶ 19 The FRSA permits continued state regulation of railroad safety concerns until such time as the Secretary of Transportation prescribes regulations or issues an order covering the subject of the state requirement.[26] The Secretary issued regulations in 1971 assigning to railroad track a numerical classification based upon various track characteristics such as gage, alignment, curvature and elevation, surface uniformity, and the physical condition of the rails.[27] The Secretary also issued regulations at that time setting the maximum permissible speed for each class of track.[28] The regulations give the railroads the primary responsibility for classifying track and hence for setting their own speed limits.[29] In *Easterwood,* the United States Supreme Court held that the speed limits were set with safety concerns in mind,[30] and "should be understood as covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings."[31] Consequently, any state-tort-law claim against a railroad based on a theory of excessive speed is preempted so long as the train in question was operating within the federally approved speed limit.

¶ 20 Plaintiffs alleged that the train in question "was traveling at a speed which was greater than reasonable, prudent, or proper for the crossing." Defendants moved for summary rejection of this theory. In support of their motion, defendants attached the affidavit of Dan Armstrong, the railroad's track inspector, who stated that it was his duty to inspect the track for compliance with federal regulations regarding track classifica-

**25.** *See* authority cited *supra* note 6.

**26.** *See* the relevant provisions of 49 U.S.C. § 20106, *supra* note 11.

**27.** *See* the provisions of 49 C.F.R. §§ 213.51–213.143

**28.** *See* the provisions of 49 C.F.R. § 213.9(a).

**29.** The Federal Railway Administration ("FRA") in its 1998 revision to the Track Safety Standards described the process as follows:

"Under the current Track Safety Standards, FRA has only an indirect role in determining speed limits. Railroads set train speed in their timetables or train orders. Once a railroad sets a train speed, it must then maintain the track according to FRA standards for the class of track that corresponds to that train speed. The signal and train control regulations also fix limits on train speed based upon the type of signal system that is in place. If the railroad fails to comply with track or signal system requirements for speed at which trains are operated, the railroad is subject to penalty." *See* Track Safety Standards, 63 Fed.Reg. 33992, 33998 (1998).

**30.** *Easterwood, supra* note 14 at 674, 113 S.Ct. at 1743. The Court acknowledged that the regulations on their face address speed only as it relates to track characteristics, but held that "related safety regulations adopted by the Secretary reveal that the limits were adopted only after the hazards posed by track conditions were taken into account." *Id.* at 674, 113 S.Ct. at 1742. The Court's conclusion is supported by the Federal Railway Administration, which stated in its 1998 revision to the Track Safety Standards:

"FRA's current regulations governing train speed do not afford any adjustment of train speeds in urban settings or at grade crossings. This omission is intentional. FRA believes that locally established speed limits may result in hundreds of individual speed restrictions along a train's route, increasing safety hazards and causing train delays. The safest train maintains a steady speed. Every time a train must slow down and then speed up, safety hazards, such as buff and draft forces, are introduced. These kinds of forces can enhance the chance of derailment with its attendant risk of injury to employees, the traveling public, and surrounding communities." *See* Track Safety Standards, 63 Fed.Reg. 33992, 33999 (1998).

**31.** *Id.* at 675, 113 S.Ct. at 1743.

tion, that the Highway 19 crossing was among the track over which he had inspection duties at the time the accident in question occurred, and that on the date of the accident the track at the Highway 19 crossing was classified as Class 3. Defendants also attached the railroad timetable which showed the speed limit for the track intersecting Highway 19 to be forty (40) miles per hour.

¶ 21 Plaintiffs concede that the speed limit for Class 3 track is 40 miles per hour and that the train with which plaintiffs' decedent collided was traveling within the speed limit, but argue that the motion should have been denied because defendants' evidentiary material failed to establish that the track in question was actually Class 3 at the time of the collision. They insist that proof of the track's classification cannot be in the form of conclusory statements by the railroad's track inspector but must consist of the inspection reports required by the federal regulations [32] or of some other "affirmative showing that at the time of the accident the track actually met the Federally mandated standards for Class 3 track." We disagree.

■■■ ¶ 22 The track inspector's affidavit meets the requirements of District Court Rule 13 that it be made on personal knowledge and that it state specific facts that would make it admissible in evidence.[33] By stating that the track was classified as Class 3 track, Mr. Armstrong was stating that the track met the federally mandated standards for that class of track. Once defendants produced this affidavit, *the burden then shifted to plaintiffs to set forth specific facts which, if true, would show either that the*

track inspector did not have personal knowledge of the track's classification or that the track did not meet the criteria for Class 3 track at the time of the collision.[34] *Plaintiffs' evidentiary material did neither.* The only material they submitted was a copy of the federal regulations regarding track classification. This did nothing to show that the track in question was not Class 3 track. Speculation that the track might not have met the standards for its classification does not establish a material factual dispute over the track's classification.[35]

¶ 23 Plaintiffs next contend that defendants are not automatically entitled to preemption of all theories involving speed even if they have complied with all the preconditions for speed preemption. In this contention plaintiffs are correct. The United States Supreme Court acknowledged in *Easterwood* that the FRSA's preemption provision, § 20106, is not absolute. It contains a saving clause under which a state may enact or continue in force an additional or more stringent law, regulation or order pertaining to a safety concern already regulated by the Secretary of Transportation, *provided that the state law* (1) is necessary to eliminate or reduce an essentially local safety hazard, (2) is not incompatible with any federal law, rule, regulation, order, or standard, and (3) does not create an undue burden on interstate commerce.[36]

■■■ ¶ 24 In *Easterwood,* the widow of a truck driver who was killed when his vehicle was struck by a train pressed a negligence claim against the railroad on the theo-

---

32. *See* the provisions of 49 C.F.R. § 213.233, which require inspections to be made by a qualified railroad track inspector in the manner set forth in the regulation and according to a prescribed schedule. The inspection records must be maintained in the manner and for the period of time specified by the provisions of 49 C.F.R. § 213.241.

33. Rule 13 of the Rules for the District Courts of Oklahoma, 12 O.S.2001 Ch. 2, App., provides in relevant part:
 "c. The affidavits that are filed by either party shall be made on personal knowledge, shall show that the affiant is competent to testify as to the matters stated therein, and shall set forth matters that are admissible in evidence."

34. *Seitsinger, supra,* note 19 at ¶ 7 at 1079 ("The moving party has the initial burden of showing that there is no substantial controversy as to any material fact. Thereafter, the opposing party must show, by materials included with the response, that there is a material fact remaining in dispute." [citations omitted] ).

35. The mere contention that disputed facts exist or might exist is not enough to defeat summary judgment. *See Loper v. Austin,* 1979 OK 84, ¶ 8, 596 P.2d 544, 546.

36. *See* the relevant portion of 49 U.S.C. § 20106, *supra* note 12.

ry that even if the train was traveling within the federally permitted speed limit, the railroad could still be held liable for breach of its common-law duty to operate the train at a moderate and safe speed given the "time and place." The United States Supreme Court rejected this argument, holding that common-law speed restrictions are not preserved by the preemption section's saving clause. The Court stated:

> The state law on which respondent relies is concerned with local hazards only in the sense that its application turns on the facts of the case. The common law of negligence provides a general rule to address all hazards caused by lack of due care, not just those owing to unique local hazards. Respondent's contrary view would completely deprive the Secretary of the power to pre-empt state common law, a power clearly conferred by § 434 [now § 20106].[37]

In other words, for a state law to meet the requirements of the FRSA saving clause, it must be narrowly addressed to a particular (essentially) local safety hazard.[38] Because the FRSA removes from states the authority to establish statewide standards with respect to railroad safety,[39] it preempts any law that creates a general standard by which the reasonableness of a train's speed is to be weighed on a case-by-case basis at any crossing in the state.[40]

¶ 25 Plaintiffs argue that the Highway 19 crossing was ultrahazardous and that the conditions making it so constituted an essentially local safety hazard within the meaning of the preemption provisions's saving clause. Whether the conditions at the Highway 19 crossing at the time of this collision might arguably have constituted an essentially local safety hazard which the state could have regulated had it chosen to do so is immaterial because there is no evidence that the state did so. The *sine qua non* of § 20106 is the enactment of a *state* law which is "necessary to reduce or eliminate an essentially local safety hazard." Plaintiffs urge this court to find such a law in the common law of negligence, but *Easterwood* makes clear that state tort law does not address local safety hazards in the sense contemplated by § 20106. Plaintiffs have failed to iden-

---

37. *Easterwood, supra* note 14 at 675, 113 S.Ct. at 1743.

38. *See* H.R.Rep No. 91–1194 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4104, 4117 ("The purpose of [§ 20106] … is to enable the states to respond to local situations not capable of being adequately encompassed within uniform national standards. The states will retain authority to regulate individual local problems where necessary to eliminate or reduce essentially local railroad safety hazards. Since these local hazards would not be statewide in character, there is no intent to permit a state to establish statewide standards superimposed on national standards covering the same subject matter."). *See also Union Pacific R.R. Co. v. Calif. Public Util. Comm'n,* 109 F.Supp.2d 1186, 1202 (N.D.Cal.2000) (concluding that for state rule-making purposes "an essentially local safety hazard is a safety hazard that is not statewide or national in character, but rather addresses a specific local concern."); *Union Pacific R.R. Co. v. Public Util. Comm'n of Oregon,* 723 F.Supp. 526, 530 (D.Or. 1989) (holding that rules imposing additional safety requirements on freight trains were not addressed to essentially local safety hazard where the alleged hazards—areas sensitive to hazardous waste materials, gradient areas, urban areas, and grade crossings where the state had imposed maximum speed limitations—were "statewide in character and capable of being addressed adequately in uniform national standards."); *Herriman v. Con-*

*rail, Inc.* 883 F.Supp. 303 (N.D.Ind.1995) ("The disruptive artificial lighting present at the Bond Avenue crossing is not an essentially local safety hazard within the meaning of the savings clause. The condition of disruptive lighting can, and does, exist at numerous crossings throughout the state, and therefore is not unique to this locality.").

39. *See* H.R.Rep No. 91–1194 (1970), *reprinted in* 1970 U.S.C:C.A.N. 4104, 4117.

40. *Williams v. Alabama Great S. R.R. Co.,* Civ. A. No. 93–2117, 1994 WL 419863 (E.D.La. Aug.8, 1994) ("The plaintiffs' claims do not fall within the savings clause because they are not based on a state law addressed to a local hazard. The plaintiffs base their claims on Louisiana's general law of negligence."); *Wright v. Illinois Cent. R.R. Co.,* 868 F.Supp. 183 (S.D.Miss.1994) ("Plaintiffs' common-law theory of negligence for failure to slow a train under certain circumstances (where "local hazards" exist), would amount to a statewide rule. The Court holds that the narrow exception provided by the savings clause for "local safety hazards" cannot be applied to uphold the application of such a statewide rule."). *But see Stone v. CSX Transp., Inc.,* 37 F.Supp.2d 789, 795(S.D.W.Va.1999) (using state negligence law as the local rule for purposes of determining whether a claim was saved under § 20106).

tify any *state law* enacted for the purpose of reducing or eliminating alleged safety hazards at the Highway 19 crossing. In light of *Easterwood,* we hold that the saving clause of § 20106 does not contemplate the survival of an excessive speed claim based upon the generalized application of state tort law to what are characterized as ultrahazardous conditions.[41]

¶ 26 Plaintiffs also argue that they may premise liability on the theory that the railroad breached a common-law duty to stop or reduce its speed to avoid a "specific, individual hazard." This argument is derived from a footnote in *Easterwood* in which the United States Supreme Court suggested in *obiter dictum* that some common-law negligence

claims *related* to speed "such as the duty to slow or stop a train to avoid a specific, individual hazard" might yet be viable despite the FRSA. Because Mrs. Easterwood's allegation that the train was traveling "too quickly given the 'time and place'" presented nothing more than an excessive speed claim, the Court in *Easterwood* declined to address the FRSA's pre-emptive effect on such related claims.[42]

 ¶ 27 The Supreme Court has not further opined on the scope or meaning of its *obiter dictum* in *Easterwood,*[43] and state and lower federal court decisions have not been uniform in fleshing out the content of the specific, individual hazard concept.[44] In light

---

**41.** Even if the common law of negligence would otherwise qualify as a state law necessary to reduce or eliminate an essentially local safety hazard, it would still have to meet the additional two requirements for survival under § 20106. We consider it unlikely that a persuasive argument could be advanced after *Easterwood* that a statewide standard such as the common law of negligence would be found both compatible with federal laws, rules, and regulations and not apt to create a burden on interstate commerce.

**42.** *Easterwood, supra,* note 14 at 675, n. 15, 113 S.Ct. at 1743, n. 15.

**43.** Among the questions left unanswered by *Easterwood* is whether a·claim based on a specific, individual hazard survives because it is outside the subject matter "covered" by the federal speed regulations and hence not subject to preemption under § 20106 or whether it comes within the covered subject matter, but is saved from pre-emption by § 20106's saving clause. *Cf. Stevenson v. Union Pacific Ry. Co.,* 110 F.Supp.2d 1086, 1088–89 (E.D.Ark.2000) ("A 'specific, individual hazard' is not to be confused with the statutory 'essentially local safety hazard' set forth in 49 U.S.C. § 20106.") and *Bashir v. Nat'l R.R. Passenger Corp.,* 929 F.Supp. 404 (S.D.Fla.1996) (holding that a claim alleging a specific, individual hazards stands without discussing whether the state law upon which the claim was premised met the other requirements of the § 20106 saving clause), *aff'd, Bashir v. Amtrak,* 119 F.3d 929 (11th Cir.1997) with *Stone v. CSX Transp., Inc., supra* note 40, *Seyler v. Burlington N. Santa Fe Corp.,* 102 F.Supp.2d 1226 (D.Kan.2000), *Earwood v. Norfolk S. Ry. Co.,* 845 F.Supp. 880 (N.D.Ga. 1993), *Bowman v. Norfolk S. Ry. Co.,* 832 F.Supp. 1014 (D.S.C. 1993), *O'Bannon v. Union Pacific· R.R. Co.,* 960 F.Supp. 1411 (W.D.Mo.1997), and *Cox v. Norfolk and Western Ry. Co.,* 998 F.Supp. 679 (S.D.W.Va.1998), all of which treat the *Easterwood* footnote as a particular application of § 20106's saving clause. If a

speed-related claim would be preempted but for the saving clause, the state law upon which it is premised must be analyzed in terms of all the criteria set forth in § 20106, including its compatibility with federal laws and its effect on interstate commerce. If it falls outside the preemption provision, those considerations may not have to be addressed. *Because we hold today that plaintiffs' proof does not establish the existence of a specific, individual hazard, we do not have to decide whether the other two factors set forth in § 20106 need to be met as well.*

**44.** The following conditions have been held to constitute a specific, individual hazard giving rise to a non-preempted state-tort-law duty to stop or to reduce a train's speed below the maximum limit established by federal law: *Bashir v. Nat'l R.R. Passenger Corp., supra* note 43 (a child standing on a track); *Shaup v. Frederickson,* No. CIV. A.–97–7260,1998 WL 726650, at *11 (E.D.Pa. Oct.16, 1998) (a car standing on a track); *Florida East Coast Ry. Co. v. Griffin,* 566 So.2d 1321 (Fla.App.1990) (deciding (pre-*Easterwood)* that the FRSA did not preempt a claim for failure to slow or stop to avoid a specific collision, to wit: a pedestrian crossing the tracks); *Central of Georgia R.R. Co. v. Markert,* 200 Ga. App. 851, 410 S.E.2d 437, 439 (1991) (deciding (pre-*Easterwood)* that the FRSA did not preempt a claim for failure to slow or stop to avoid a specific collision, to wit: an imminent collision with a car crossing the tracks), *cert. denied; Bakhuyzen v. Nat'l Rail Passenger Corp.,* 20 F.Supp.2d 1113, 1118 (W.D.Mich.1996) (poor visibility due to snow); *Missouri Pacific R.R. Co. v. Lemon,* 861 S.W.2d 501, 510 (Tex.App.1993) (line of improperly parked tank cars obscuring view of engineer who knew of other factors making the crossing dangerous); *Stone, supra* note 40 (terrain, obstructed sight lines and limited access together with repeated signal apparatus malfunctions at crossing); and *Alcorn v. Union Pacific R.R. Co.,* 50 S.W.3d 226, 242 (Mo.2001)

of *Easterwood* and having considered the various views espoused in its progeny, we hold that a specific, individual hazard is a person, vehicle, obstruction, object, or event which is not a fixed condition or feature of the crossing and which is not capable of being taken into account by the Secretary of Transportation in the promulgation of uniform, national speed regulations.[45] In short,

(the unwavering approach of a vehicle at a railroad crossing, where the engineers knew or should have known that a collision was imminent). The following conditions have been held not to constitute a specific, individual hazard giving rise to a duty to reduce a train's speed below the maximum limit established by federal law or to stop: *Earwood v. Norfolk S. Ry. Co.*, *supra* note 43 (multiple tracks and rail cars obstructing the view); *Bowman v. Norfolk S. Ry. Co.*, *supra* note 43 (an ultrahazardous crossing due to trucks transporting hazardous materials, heavy traffic, and a previous accident); *O'Bannon v. Union Pacific R.R. Co.*, *supra* note 43 (a dangerously designed crossing including inadequate warning devices, an obscured view due to the angle at which the track crossed the highway, and a steep grade), *aff'd*, 169 F.3d 1088 (8th Cir.1999); *Armstrong v. Atchison, Topeka & Santa Fe Ry. Co.*, 844 F.Supp. 1152 (W.D.Tex.1994) (high vehicular traffic area lacking an automatic gate with flashing lights); *Cox v. Norfolk and Western Ry. Co.*, *supra* note 43 (snow-covered crossing); *Williams v. Alabama Great S. R.R. Co.*, *supra* note 40 (presence of fog and brick facility); *Beausoleil v. Nat'l R.R. Passenger Corp.*, 145 F.Supp.2d 119 (D.Mass.2001) (general knowledge of a chronically dangerous condition such as disembarking passengers habitually crossing the tracks); *Stuckey v. Illinois Cent. R.R. Co.*, No. 2:96CV47–B–B, 1998 WL 97270 (N.D.Miss. Feb.10, 1998), *aff'd, without opinion* 162 F.3d 96 (5th Cir.1998) (icy conditions which were not limited to subject crossing, but were prevalent throughout area); *Seyler v. Burlington N. Santa Fe Corp.*, *supra* note 43 (heavy rainfall combined with weather service warnings of flash floods); *Furlough v. Union Pacific R.R. Co.*, 766 So.2d 751(La.App.2000), *writ denied*, 781 So.2d 556 (La.2001) (obstructed sight line, rough crossing, parallel roadways, inadequate warning devices, inoperative ditch lights and inclement weather); *Steva v. Soo Line R.R. Co.*, No. 96–4198NI, 1997 WL 381854, 117 F.3d 1423 (8th Cir.1997) (unpublished disposition) (high traffic volume, grade/angle of the crossing, and surrounding vegetation); *Herriman v. Conrail, Inc.*, *supra* note 38 (artificial lighting that obscured the train's headlight).

**45.** Because this is a question of first impression in Oklahoma, we have carefully considered the extant federal and state decisions that have found a specific, individual hazard exists and find the pronouncements in *Bashir, Shaup, Griffin, Markert, Bakhuyzen,* and *Alcorn, supra* note 44, to be sound. These courts have concluded that the phrase specific, individual hazard was used in *Easterwood* to describe the avoidance of an imminent collision with a specific person or object. The decisions in *Stone, supra* note 40, and *Lem-*

*on, supra* note 44, on the other hand, give the phrase a broader construction. While those two decisions may be justified in light of specific peculiarities in their fact patterns, we conclude that neither case provides a sound rule of general applicability. In *Lemon* the court held that a line of tank cars was improperly parked in violation of state statute and safety rules within one hundred and five feet from the crossing at issue. The tank cars obstructed the train crew's view of the plaintiff's approach to the intersection. Additionally, the crossing was very dark, was not protected by any device to warn an approaching motorist that a train was actually coming, contained multiple tracks, was elevated above the road level, and the road curved as it approached the tracks from the direction plaintiff was traveling. The court held that the illegally and improperly parked tank cars, a hazard which had not been taken into consideration when the FRSA speed limit was determined, constituted a specific, individual hazard which required the train to reduce its speed until its crew had a clear view of the intersection. The railroad's illegal conduct played a critical role in the *Lemon* decision, with the court noting that such conduct was not a condition that could be adequately encompassed within federal speed regulations.

In *Stone,* the Court treated § 20106's preemption exception for "an essentially local safety hazard" as synonymous with the *Easterwood* footnote's "specific, individual hazard" language and concluded that an automatic gate which falsely activated so often it ceased to offer a credible warning of a train's approach qualified as an essentially local safety hazard. Consequently, a common-law claim that the railroad breached a duty of care to protect the public from the danger posed by such false activations was not preempted. Because the crossing was the sole means of ingress and egress from the town, "drivers accustomed to false activations would be constantly faced with a Hobson's choice—remain trapped in Ventroux Hollow or venture past the signal apparatus and take your chances on being hit by a train. An activated signal under the circumstances is virtually meaningless." *Id.* at 796. Recognizing *Easterwood's* holding that the common law of negligence was not a state law "necessary to the elimination of essentially local safety hazards" and the Supreme Court's concern that a contrary view would frustrate the FRSA's ability to achieve national railroad safety uniformity, the *Stone* court distinguished its seemingly contrary holding by emphasizing that its pronouncement (1) applied solely to the particular crossing at issue and (2) imposed no greater or dissimilar duties

a specific, individual hazard refers to a unique occurrence which could lead to a specific and imminent collision [46] and not to allegedly dangerous conditions at a particular crossing.[47]

¶ 28 Plaintiffs proffered evidence of many conditions that allegedly made the Highway 19 crossing ultrahazardous as well as evidence that the railroad was aware of these conditions.[48] While these factors might have warranted state action to regulate the Highway 19 crossing as an essentially local safety hazard, they do not constitute a specific, individual hazard because they have nothing to do with the avoidance of a specific collision. Hazards posed by track conditions, including those existing at grade crossings, are capable of being taken into account by the Secretary and are covered by the federal speed regulations.[49] Factors such as general knowledge that a crossing is dangerous, traffic conditions, a crossing's accident history, sight distances, multiple crossings in close proximity, sun glare, a railroad's internal policies regarding speed, and inadequate signal maintenance are not specific, individual hazards.[50]

## V

## WAS THE JURY CORRECTLY INSTRUCTED?

¶ 29 Plaintiffs assign four errors to the instructions given or refused by the trial court. In reviewing assigned error in

---

on the railroad than were already imposed by federal regulations covering a railroad's duties upon receipt of a credible report of a false signal activation. *See* 49 C.F.R. § 234 *et seq.* Consequently, the *Stone* court viewed its decision as presenting no danger to the federal regulatory scheme.

**46.** *Shaup v. Frederickson, supra* note 44 at *11; *Armstrong v. Atchison, Topeka & Santa Fe Ry. Co.,* 844 F.Supp. 1152, 1153 (W.D.Tex.1994); *Furlough v. Union Pacific R.R. Co., supra* note 44.

**47.** *Paddock v. Tuscola & Saginaw Bay Ry. Co., Inc.,* 225 Mich.App. 526, 571 N.W.2d 564, 566 (1997).

**48.** This evidence consisted of the following: (1) an Apache city ordinance limiting train speed to 25 miles per hour through the city, which plaintiffs argued indicated that (a) city officials considered the Highway 19 crossing dangerous, and (b) the railroad had at least constructive notice that the Highway 19 crossing was dangerous; (2) the railroad's policy of working with cities to identify conditions that local officials consider dangerous; (3) the presence of five crossings within one-half mile in Apache; (4) a history of accidents at the Apache crossings; (5) the existence of crossings that were "out of compliance" with the Manual on Uniform Travel Control Devices; (6) the fact that a significant number of school busses cross the tracks at Highway 19; (7) the fact that compliance with the city's 25 mile per hour speed limit for the half-mile of track within Apache would add less than ten minutes to a twelve hour trip; (8) the fact that the average speed over the entire length of the spur of track that runs through Apache is 23 miles per hour; (9) the fact that the train travels at 40 miles per hour only over the thirteen miles of track that includes Apache; and (10) the long-standing presence of a low voltage condition in

---

the flashing light system at the Highway 19 crossing. Plaintiffs also filed a document captioned "Offers of Proof Regarding Evidence Excluded by Court Rulings," in which they refer to four items of evidence that they argue should have been admitted in support of a speed-related claim. Three of the items—signal misalignment, sun glare, and low voltage in the signals' electrical circuits—were in fact admitted into evidence. The fourth item was evidence of "a signal failure" and "the signal's history of malfunction." If by signal failure and malfunction plaintiffs mean the signals sometimes operated when a train was not present, evidence of that condition was admitted through a number of witnesses. If plaintiffs had some other form of signal failure or malfunction in mind (other than operating dimly due to low voltage or not being visible due to misalignment), they never specified what that malfunction was.

**49.** *Easterwood, supra* note 14 at 674, 113 S.Ct. at 1742.

**50.** Even though inadequate signal maintenance may not be considered a specific, individual hazard for purposes of imposing liability for failure to reduce a train's speed, it may serve as an independent basis of negligence liability. Plaintiffs in this case presented evidence of signal misalignment, a low voltage condition to the flashing signals, and a history of false activations by the flashing lights. Had the jury found that these conditions existed, it could have imposed liability on defendants for failure to maintain the signals in a manner that provided adequate warning of the train's approach. Defendant Collins, the train's engineer, testified that a slow order should be issued if such conditions existed because they could interfere with the visibility of the flashing signals. Hence the jury was presented with evidence of the train's duty to reduce its speed if these conditions existed.

jury instructions, this court must consider the instructions as a whole.[51] We inquire on review whether the instructions reflect the Oklahoma law on the relevant issue, not whether the instructions were perfect.[52] A judgment will not be disturbed on appeal unless it appears reasonably evident that the jury was misled by the allegedly erroneous instruction.[53] By statute an appellate court may not disturb a judgment for misdirection of the jury in the absence of a miscarriage of justice or a substantial violation of the complaining party's constitutional or statutory rights.[54] We have oft stated that the test upon review of an instruction urged as improperly given or refused is whether there is a probability that the jury was misled into reaching a result different from that which would have been reached but for the error.[55] Applying these principles, we find no error in

the instructions that would require the judgment under review to be reversed.

■ ¶ 30 Plaintiffs challenge the trial court's refusal to instruct the jury on negligence *per se* in relation to the railroad's failure to comply with two statutes, the first requiring a railroad to erect suitable signs of caution and the second requiring a railroad to maintain its crossings in good condition.[56] We discern no error in the *nisi prius* ruling refusing to give this instruction. The first statute would have placed before the jury an issue preempted by federal law—the adequacy of the existing warning devices. The second requires the railroad to maintain the surface of the roadway traversing the tracks unobstructed and in good condition for the use of the public.[57] This statute was not relevant to any issue in this case.

**51.** *Dutsch v. Sea Ray Boats, Inc.*, 1992 OK 155, ¶ 7, 845 P.2d 187, 189; *Messler v. Simmons Gun Specialties, Inc.*, 1984 OK 35, ¶ 25, 687 P.2d 121, 129.

**52.** *Dutsch, supra,* note 51 at ¶ 7, at 189; *Nealis v. Baird,* 1999 OK 98, ¶ 15, 996 P.2d 438, 444.

**53.** *Messler, supra,* note 51 at ¶ 25, at 129; *See also, Lee v. Volkswagen of America,* 1984 OK 48, ¶ 34, 688 P.2d 1283, 1289–90.

**54.** The provisions of 20 O.S.2001 § 3001.1 state:
"No judgment shall be set aside or new trial granted by any appellate court of this state in any case, civil or criminal, on the ground of misdirection of the jury or for error in any matter of pleading or procedure, unless it is the opinion of the reviewing court that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right."
The provisions of 12 O.S.2001 § 78 state:
"The court, in every stage of action, must disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error or defect."

**55.** *Dutsch, supra,* note 51 at ¶ 7, at 189; *Woodall v. Chandler Material Co.,* 1986 OK 4, ¶ 13, 716 P.2d 652, 654; *Reinhart & Donovan Co. v. Williamson,* 1942 OK 408, ¶ 10, 131 P.2d 765, 766.

**56.** The requested instruction stated:
"In addition to the duty to exercise ordinary care there are also duties imposed by statutes. If you find that a person violated [any one of] the following statutes and the violation was the direct cause of the injury, then such violation in and of itself would make such person negligent. There was in force and effect in Oklahoma, at the time of the occurrence the following statutes:
**66 O.S. § 124, Signs at Crossings:**
'Every railroad corporation operating a line of road within this State must erect suitable signs of caution at each crossing of its road with a public highway.'
You are instructed that under the law of Oklahoma, Missouri Pacific had a duty to erect suitable signs of caution at the crossing at issue. If you find that it did not and the failure to do so was a direct or proximate cause of Lesa Myers' death, then that failure in and of itself makes Missouri Pacific negligent."
**66 O.S. § 128, Construction and Maintenance of Crossings:**
It shall be the duty of every railroad company or corporation doing business, or operating a line of railroad within the State of Oklahoma to construct a crossing across that portion of its track, roadbed or right-of-way over which any public highway may run, and maintain the same unobstructed, in good condition for the use of the public.'
You are instructed that under the law of Oklahoma, Missouri Pacific had a duty to maintain the crossing at issue unobstructed and in good condition for the use of the public. If you find that it did not and the failure to do so was a direct or proximate cause of Lesa Myers' death, then that failure in and of itself makes Missouri Pacific negligent."

**57.** *Atchison, T. & S.F. Ry. Co. v. Wooley,* 1919 OK 385, ¶ 15, 189 P. 180, 182 (holding that § 128, construed in conjunction with certain related statutes, means that a railroad must maintain a highway or street intersecting its track in such a condition as not to materially impair the roadway's usefulness as a highway).

¶ 31 Plaintiffs next assign error to the trial court's failure to instruct the jurors that they must apportion fault under Oklahoma's comparative negligence regime between all potentially liable persons, including persons not parties to the lawsuit.[58] This court has held that "the negligence of tortfeasors not parties to the lawsuit should be considered by the trial jury *in order to properly apportion the negligence of those tortfeasors who are parties.*"[59] (emphasis added) The non-party apportionment rule exists for the benefit of those who are named as defendants in a lawsuit. Its effect is to reduce their potential liability where the negligence of one or more "ghost tortfeasors" contributed to the plaintiff's damages. Naming additional persons as potential tortfeasors cannot increase a defendant's share of liability. Hence, the failure to include potential non-party tortfeasors in instructions, if error, is harmless as to plaintiffs.

¶ 32 Plaintiffs next assert that the trial court committed reversible error in giving the following instruction:

### INSTRUCTION NO. 21

You are instructed that where a railroad train and a motor vehicle are approaching an intersection of a street and a railroad track, the railroad train has the right of way over the approaching vehicle.

Plaintiffs argue that this instruction places the entire burden of avoiding an accident on the motorist and is therefore tantamount to a directed verdict for the railroad. We agree that this instruction standing alone is overbalanced in favor of the railroad,[60] but upon

---

**58.** In addition to the two named defendants, other persons potentially at fault in this case were Gilmore, the plaintiffs' decedent, and two other passengers. This court has held that a passenger's failure to warn a driver of an observed danger or to remonstrate with a person driving recklessly may constitute negligence. *See Morris v. Sorrels*, 1992 OK 125, ¶ 10, 837 P.2d 913, 916 ("A passenger has a duty to caution a driver if the driver is driving recklessly.").

**59.** *Paul v. N.L. Industries, Inc.*, 1980 OK 127, ¶ 5, 624 P.2d 68, 69.

**60.** Instruction No. 21 advises the jury that a train's precedence over an approaching vehicle at a crossing is *absolute*. It is only accurate where the railroad has acted in conformity with its duty of care to warn motorists of a train's approach. Where it has done so and a motorist is or should be aware of an approaching train, the burden is on the motorist to yield. This is a practical rule rooted in physics: a train's crew usually does not become aware that a collision is imminent until it is physically too late to stop the train to avoid impact. The right of way rule simply recognizes this fact and, *in the absence of extenuating circumstances*, requires the motorist to yield to the train. If a motorist is not aware of a train's presence and that lack of awareness is solely or predominantly a result of the railroad's negligence, then the motorist may be excused for failing to yield the right of way. Instruction No. 21 is overbalanced in favor of the railroad by placing an unconditional duty upon the motorist to yield to the train without reference to the railroad's duty of care for the motorist's safety. The source of Instruction No. 21 is this court's decision in *Jester v. St. Louis–San Francisco Ry. Co.*, 1965 OK 180, 413 P.2d 539, which states: "A highway traveler must yield to an approaching train which has the right-of-way,

and those operating the train *lawfully* may predicate their course of action upon the assumption that such traveler will obey the law in this respect." (emphasis added) *Id.* at ¶ 14, at 542. The syntax of this sentence is rife with ambiguity and plaintiffs and defendants interpret it in distinct ways. Plaintiffs argue that the court used the word "lawfully" in *Jester* to modify the verb "operating" so that the quoted sentence means that only "those operating the train lawfully," i.e., not negligently, may assume that a motorist will stop. Defendants argue that the court in *Jester* used the word "lawfully" to modify the verb phrase "may predicate" so that the quoted sentence means that those operating the train "lawfully may predicate their course of action upon the assumption that such traveler will obey the law ..." Defendants' interpretation is in fact the correct one. The *Jester* formulation is simply a paraphrase of text from 44 Am.Jur, *Railroads*, § 495 (1942), which states:

§ 495. Reciprocal Rights and Duties of Railroad Companies and Public.

But while the relative rights and obligations of a railroad company and travelers on the highway are reciprocal, it is the privilege of the railroad company that its trains shall have the right of way, and that all persons on the highway shall yield precedence to the trains. From the character and momentum of a railroad train, and the requirements of public travel by means thereof, it cannot be expected that it shall stop and give precedence to an approaching traveler to make the crossing first; the traveler must yield the use of the railroad track to an approaching train, and *the conduct of the train crew may be lawfully predicated upon the expectation that travelers will observe their duty in this regard.* (emphasis added)

In a case such as this where the plaintiffs allege that the defendants failed in their primary

consideration of the instructions as a whole conclude that they fairly and accurately reflect the Oklahoma law on the relative duties of railroads and motorists. The instructions advised the jury to consider all the instructions together and not to focus on one to the exclusion of the others. They informed the jurors that the public has a right to rely upon the exercise of reasonable care by the railroad in maintaining crossing signals in good repair and efficient working condition, and that a motorist is required to stop at a railroad crossing only if: (1) a clearly visible electric or mechanical signal device gives sufficient warning of the train's proximity, (2) the train emits a signal audible from approximately 1,500 feet from the crossing and the train is an immediate hazard based upon its speed, or (3) the train is plainly visible and is in hazardous proximity to the crossing. Upon consideration of the instructions in their entirety, we conclude that they were adequate and that they did not misdirect the jury or constitute a substantial violation of a constitutional or statutory right.

■■■ ¶ 33 Finally, plaintiffs assign error to the trial court's refusal to give four proffered instructions on the issue of the ultrahazardousness of the Highway 19 crossing.[61] The ultrahazardous crossing doctrine holds that a railroad's common-law duties may be expanded at ultrahazardous crossings to require extra-statutory warnings deemed necessary to alleviate the dangers posed by special circumstances.[62] To the extent that the question of ultrahazardousness was raised by

duty to warn the motorist that the train is approaching, an instruction such as the one given in this case based on the *Jester* formulation ignores the reasonable care standard imposed on both the railroad and the motorist, places the entire burden of avoiding the collision on the motorist, and is hence confusing. An instruction providing such an absolute rule is only useful in a case such as *Jester* involving the last clear chance doctrine in which the motorist admits he has placed himself in a position of peril through his own negligence, but alleges that the train's crew knew or should have known of his position of peril in time to avoid the collision. In that case, where the railroad is not responsible for the motorist's lack of awareness of the train's approach, the train's crew is exercising reasonable care when it assumes the motorist will stop. The same cannot be said when the railroad is allegedly responsible for the motorist's failure to perceive that a train is approaching. In *Clements v. Atchison, T. & S.F. Ry. Co.*, 1926 OK 873, 253 P. 496, this court reversed a jury verdict for the railroad in a car-train collision case because a series of instructions implied that the railroad always had the right of way. In that case, we said,

"The effect of the several instructions was to tell the jury that the train took precedence in the use of a crossing, in every instance, against the use by a member of the traveling public, without regard to the nature, situation, and condition of the crossing. This may, or may not be true, according to the particular circumstances of the case. The right of precedence depends on the railway exercising that degree of care, for the safety of a traveler, which an ordinarily prudent person would exercise for the safety of another, under like circumstances. The apparent situation of the traveler, the obstructions which might affect the vision of both parties, and the weather conditions would enter into the determination of the question of precedence....Whether the railway was entitled to precedence in the use of the crossing on this occasion was a question of fact for the jury, to be determined from all of the evidence by the application of the foregoing rules." [citations omitted]

**61.** Plaintiffs' Proposed Instruction No. 41 would have provided the jury with a list of hazardous conditions and would have required the jury to determine from that list whether the Highway 19 crossing was ultrahazardous. Plaintiffs' Proposed Instruction No. 34 would have permitted the jury to consider whether the crossing was ultrahazardous because of a failure by the railroad to provide adequate warning devices. Plaintiffs' Proposed Instruction No. 32 would have advised the jury that where a crossing is ultrahazardous the railroad has a higher duty of care than that met by giving the statutorily-required warnings of its approach. Plaintiffs' Proposed Instruction No. 44 would have advised the jury that the railroad cannot rely on a driver to stop where a crossing is ultrahazardous.

**62.** *Walker v. St. Louis–San Francisco Ry. Co.* 1982 OK 25, 646 p.2d 593 ("Liability may be imposed absent a statutory requirement if the facts of the particular case are such as to give the railroad the duty to warn the traveling public of the extra-hazardous nature of the crossing. The question of the presence of an extra-hazardous crossing should be left to the jury's determination."). *Id* at ¶ 9, at 596–597. *See, e.g., St. Louis–San Francisco Ry. Co. v. Pufahl*, 1935 OK 614, ¶ 14, 45 P.2d 729, 732 (holding that statute requiring train to ring bell or sound whistle was "not intended to furnish a standard by which to determine in every case whether or not such company had failed to discharge its duty in respect to giving sufficient warning to the traveling public of the approach of trains, but it is intended rather to prescribe the minimum of care

plaintiffs to prove that defendants breached common-law duties regarding warning devices and speed, the trial court's refusal to instruct on ultrahazardousness was correct in light of today's pronouncement that those theories of liability are preempted.

¶ 34 With respect to plaintiffs' theory that the warning devices were improperly maintained, the trial court gave the following instruction:

> Where the railroad crossing signals are maintained by a railroad, even though the law does not require them to be installed, the public has a right to rely upon the exercise of reasonable care on the part of the railroad to keep them in good repair and in efficient working condition, and the failure to do so is a fact for you to consider in determining whether or not the railroad was negligent.

We conclude that this instruction correctly states the railroad's duty of care. The duty to maintain the signals "in good repair and efficient working condition" does not vary depending on the degree of hazardousness of the crossing.

¶ 35 We also conclude that the absence of instructions on ultrahazardousness in relation to the train's auditory warnings did not result in a verdict different from that which would have been reached had such

instructions been given. While the testimony was mixed, there was ample evidence that the train's crew blew the whistle not just at the distance required by statute, but as near to the Highway 19 crossing as the immediately preceding crossing,[63] and again as it entered the Highway 19 crossing. There was testimony, too, that the crew sounded the whistle *continuously* as the train proceeded through Apache. The jury's general verdict found this issue in favor of defendants and is conclusive as to all disputed facts and conflicting statements.[64] The verdict must be understood as having resolved the factual dispute regarding the frequency and effectiveness of the whistle in favor of defendants. Even assuming the crossing was ultrahazardous, there is competent evidence in the record to support the jury's verdict that the train's crew gave adequate auditory warnings of its approach. Additionally, the jury's general verdict constitutes a finding that the flashing signals were working as they were intended and should have given Gilmore warning of the train's approach even if the whistle had never sounded.[65]

## VI

### THE TRIAL COURT'S EVIDENTIARY RULINGS WERE CORRECT

¶ 36 Plaintiffs assign error to two

which must be observed in all cases."). The ultrahazardous crossing doctrine developed in grade crossing accident litigation in response to the railroads' defense that they could not be held liable for negligence so long as they complied with a state's statutory requirements for signalizing railroad crossings. In order to get around that argument, courts said that at the ordinarily dangerous crossing, compliance with statutory law was enough, but if a crossing was ultrahazardous, then the railroad's duty of care might require extra-statutory warnings or precautions. *Stevens v. Norfolk and Western Ry. Co.,* 171 Ind. App. 334, 357 N.E.2d 1, 4 (1976) (holding that if, under all circumstances, grade crossing is extra hazardous, railroad can be found negligent for its failure to adequately protect the public from danger by providing warnings and taking safety precautions in addition to those required by statute).

63. No testimony was given regarding the precise distance between each of the five crossings in the city of Apache. There was testimony that the first crossing coming from the south was approximately one-quarter mile (1320 feet) from the

Highway 19 crossing and that the Coblake crossing, the crossing immediately preceding Highway 19 to the south, was but a short distance from the Highway 19 crossing.

64. A general verdict is one in which a jury pronounces generally upon all or any of the issues, either in favor of the plaintiff or defendant. The provisions of 12 O.S.2001 § 587 provide: "A general verdict is that by which ... [jurors] pronounce generally upon all or any of the issues, either in favor of the plaintiff or defendant." *See Grumman Credit Corp. v. Rivair Flying Service, Inc.,* 1992 OK 133, ¶ 10, 845 P.2d 182, 185; *Bane v. Anderson, Bryant & Co.,* 1989 OK 140, ¶ 21, 786 P.2d 1230,1235("[A] general verdict of a jury constitutes a finding of every material fact necessary to support it, and is conclusive as to all disputed facts and conflicting statements.").

65. *Hamilton v. Allen,* 1993 OK 46, ¶ 15, 852 P.2d 697, 700 ("The purpose of a light on the train and of a whistle would be to warn a motorist of an approaching train. The warning flasher and the lowered cross bar served that same pur-

of the trial court's evidentiary rulings.[66] Under the Oklahoma Evidence Code, the trial court stands as a "gatekeeper," admitting or excluding evidence based on the judge's assessment of its relevance and reliability.[67] All relevant evidence is admissible,[68] unless the trial court determines that "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise."[69] A trial court has discretion in deciding whether proffered evidence is relevant and, if so, whether it should be admitted, and a judgment will not be reversed based on a trial judge's ruling to admit or exclude evidence absent a clear abuse of discretion.[70] We conclude that no abuse of discretion attended the trial court's evidentiary rulings.

¶ 37 Plaintiffs argue that the trial court erred by excluding from the liability stage of the trial evidence of railroad policies illustrating the latter's indifference to safety issues as well as evidence demonstrating that the railroad benefited financially from ignoring maintenance and safety issues.[71] We

disagree. It was within the trial court's discretion to exclude such evidence as was only marginally relevant to a determination of the railroad's negligence with respect to the particular crossing in question, or was highly prejudicial to a reasoned evaluation of the railroad's conduct, or both.

## VII

## POST TRIAL REVIEW OF PROCESS UPON A MOTION FOR SUMMARY JUDGMENT MAY NOT BE UNDERTAKEN AFTER THE MOTION'S PRETRIAL DENIAL

¶ 38 Among the issues tendered for certiorari review by defendants is the trial court's error in the denial of their 10 August 1998 motion for summary judgment upon plaintiffs' entire claim based on Gilmore's purported negligence *per se* in failing to stop at the crossing for the flashing lights. Although defendants characterize the error as harmless in light of the judgment in their favor, they nevertheless continue to press for its review.

pose."). *See also* the provisions of 47 O.S.2001 § 11–701(a).

66. Plaintiffs assign error to the trial judge's liminal rulings, but liminal rulings are not appealable. The party against whom a liminal ruling is made must re-press the issue at trial and obtain a final order. Only the latter is appealable. In *Middlebrook v. Imler, Tenny & Kugler, M.D.'s, Inc.*, 1985 OK 66, ¶ 12, 713 P.2d 572, 579, this court said,

"The function of a motion in limine is to preclude introduction of prejudicial matters to the jury. (citation omitted) Rulings on the motion, however, occur before the point at which the evidence would be admitted or rejected The motion is therefore preliminary and advisory in nature until the point of trial at which the evidence would have been admitted but for the motion in limine. Only at such time can the trial judge finally determine if the questioned evidence is admissible considering the facts and circumstances of the case before him. It is thus incumbent upon a party aggrieved by an order in limine to raise the issue at the appropriate time during the trial, either by objecting when the challenged evidence or testimony is admitted or by making an offer of proof of the excluded matter. (citation omitted) Error is committed, if at all, when in the course of the trial the court rules on the matter. (citation omitted)"

Evidentiary rulings on the matters assigned here as error occurred during the trial of this cause, and it is those rulings that we address.

67. *Cities Service Co. v. Gulf Oil Corp.*, 1999 OK 14, ¶ 32, 980 P.2d 116, 132, *cert. dismissed*, 528 U.S. 1014, 120 S.Ct. 523, 145 L.Ed.2d 404 (1999).

68. The terms of 12 O.S.2001 § 2402 provide:

"All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of Oklahoma, by statute or by this Code. Evidence which is not relevant is not admissible."

69. *See* the terms of 12 O.S.2001 § 2403, which provide:

"Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise."

70. *Cities Service Co., supra* note 67.

71. These alleged policies include the railroad's policy not to identify extra-hazardous crossings, to ignore known and existing safety hazards, and to purposely neglect to train its personnel to identify extra-hazardous crossings.

¶ 39 This court has not previously decided whether *post-trial review may be undertaken of the nisi prius denial of a motion for summary judgment.*[72] *We hold today that it may not.* A motion for summary judgment, if denied, simply determines that material fact issues exist which warrant a trial. Once that trial occurs, the ends of orderly procedure sought to be achieved by summary process—to expeditiously dispose of cases where the absence of material factual disputes demonstrates that the expense and delay of a trial is unnecessary—would not be furthered by a post-trial inquiry into the correctness of the pretrial ruling. Furthermore, it would be anachronistic after a case has been tried on the merits to review that case on pretrial submissions alone rather than upon the evidence and record as a whole. In short, summary process and trial are separate decisional tracks conducted according to different evidentiary rules. Once a decision in the latter has been reached, the two tracks merge and summary-disposition process disappears as a separately reviewable procedure. We review only that process by which the actual disposition of the case was made.

¶ 40 At least ten federal circuit courts have held that the denial of a summary judgment motion is not reviewable on appeal.[73] A number of state appellate courts have made similar pronouncements.[74]

¶ 41 Our refusal to grant review of a denial of summary adjudication does not preclude post-trial appellate review of the contention that a party was entitled to judgment as a matter of law. Procedural mechanisms for pressing the issue after a trial commences or has concluded include a demurrer to the evidence,[75] a motion for a directed verdict[76] and a motion for judgment notwithstanding the verdict,[77] the denial of any of

---

**72.** Of course, prejudgment review of an order denying summary judgment is precluded by Rule 1.50, 12 Okla. Stat.2001 Ch. 15, App., Rules of the Oklahoma Supreme Court, which states in pertinent part:

"No certified interlocutory order shall be considered if taken from an order overruling a motion for summary judgment."

**73.** *See Lind v. United Parcel Service, Inc.,* 254 F.3d 1281,1286 (11th Cir.2001); *Pahuta v. Massey–Ferguson, Inc.,* 170 F.3d 125, 130 (2d Cir. 1999); *Chesapeake Paper Products Co. v. Stone & Webster Engineering Corp.,* 51 F.3d 1229, 1237 (4th Cir.1995); *Watson v. Amedco Steel, Inc.,* 29 F.3d 274, 278 (7th Cir.1994); *Black v. J.I. Case Co., Inc.,* 22 F.3d 568, 570–71 (5th Cir.1994); *Johnson Int'l Co. v. Jackson Nat'l Life Ins. Co.,* 19 F.3d 431, 434 (8th Cir.1994); *Lama v. Borras,* 16 F.3d 473, 477, n. 5 (1st Cir.1994); *Whalen v. Unit Rig, Inc.,* 974 F.2d 1248, 1251 (10th Cir. 1992); *Jarrett v. Epperly,* 896 F.2d 1013, 1016 (6th Cir.1990); *Locricchio v. Legal Servs. Corp.,* 833 F.2d 1352,1359 (9th Cir.1987); *Glaros v. H.H. Robertson Co.,* 797 F.2d 1564, 1573 & n. 14 (Fed.Cir.1986), *cert. dismissed, H.H. Robertson Co. v. Glaros,* 479 U.S. 1072, 107 S.Ct. 1262, 94 L.Ed.2d 124 (1987).

**74.** *McLain v. Ortmeier,* 259 Neb. 750, 612 N.W.2d 217, 222 (2000); *Feiger, Collison & Killmer v. Jones,* 926 P.2d 1244, 1250 (Colo. 1996); *Bigney v. Blanchard,* 430 A.2d 839, 842 (Me.1981); *American Physicians Ins. Co. v. Hruska,* 244 Ark. 1176, 428 S.W.2d 622, 624–25 (1968) (concluding that final judgment should be tested upon the record as it exists at the time it is rendered rather than at the time the motion for summary judgment is denied as deficiencies in evidence at that stage of the proceeding may well be supplied by evidence from trial); *Holloman v. McAllister,* 289 S.C. 183, 345 S.E.2d 728, 729 (1986); *Del Rossi v. Doenz,* 912 P.2d 1116, 1118 (Wyo.1996); *Bell v. Harmon,* 284 S.W.2d 812, 814(Ky.1955); *Bruno v. Hartford Accident & Indemnity Co.,* 337 So.2d 241, 242 (La.App.1976);*Pleasure Driveway and Park District of Peoria v. Kurek,* 27 Ill.App.3d 60, 325 N.E.2d 650, 656 (1975). *See also* R.F. Chase, Annotation, *Reviewability of Order Denying Motion for Summary Judgment,* 15 A.L.R.3d 899 (1967).

**75.** *See* the provisions of 12 O.S.2001 § 577, subd.3, which state:

"The party on whom rests the burden of the issues must first produce his evidence; after he has closed his evidence the adverse party may interpose and file a demurrer thereto, upon the ground that no cause of action or defense is proved. If the court shall sustain the demurrer, such judgment shall be rendered for the party demurring as the state of the pleadings or the proof shall demand. If the demurrer be overruled, the adverse party will then produce his evidence."

**76.** *Drouillard v. Jensen Constr. Co. of Okla., Inc.,* 1979 OK 126, ¶ 6, 601 P.2d 92, 93–94.

**77.** See the provisions of 12 O.S.2001 § 698, which state in pertinent part:

"When a motion for a directed verdict made at the close of all of the evidence should have been granted, the court shall, at the request of the moving party, grant judgment in the mov-

which produces after trial a reviewable ruling.

## VIII

## SUMMARY

¶ 42 COCA's reversal of the judgment in this case is vacated and the trial court's judgment on jury verdict is affirmed. Plaintiffs may not press their claim of negligence on the theories of inadequate signalization or speed because those theories are preempted by federal law. As for the issues left unaddressed by COCA, we hold that any errors at *nisi prius* in the instructions given or refused were harmless and that the trial judge's evidentiary rulings were correct. Viewing plaintiffs' negligence claim within the parameters authorized by federal law, the jury has determined that legal responsibility for the tragic loss of life at the Highway 19 crossing is not assignable to the railroad. We find no error in the proceedings which requires that decision to be reversed.

¶ 43 THE COURT OF CIVIL APPEALS' OPINION IS VACATED; THE JUDGMENT OF THE TRIAL COURT IS AFFIRMED.

¶ 44 ALL JUSTICES CONCUR.

ing party's favor, although a verdict has been found against the moving party, ..."