2014 OK 15

Jackie Eugene ELLISON, a/k/a Gene Ellison, individually and as Trustee of the Equivalent Exemption Trust Created Pursuant to Article V, VII, and VIII of the Last Will and Testament of Glen G. Ellison, Deceased; Marcia Ellison, an individual; Richard M. Healy, P.C., an Oklahoma Corporation; Jayne Jarnigan Robertson, P.C., an Oklahoma Professional Corporation; and Michael J. Blaschke, P.C., an Oklahoma Professional Corporation, Plaintiffs/Appellees,

v.

Michael D. CAMPBELL, an individual, and M.D. Campbell & Associates, L.P., a Texas Limited Partnership, Defendants/Appellants.

No. 108468.

Supreme Court of Oklahoma.

March 11, 2014.

Rehearing Denied May 12, 2014.

Jayne Jarnigan Robertson, Jayne Jarnigan Robertson, P.C., Oklahoma City, Oklahoma, for plaintiffs/appellees, Michael J. Blaschke, P.C., Jackie Eugene Ellison, Marcia Ellison, Richard M. Healy, Jayne Jarnigan Robertson, P.C.

Andrew E. Karim, KARIM LAW OFFICE, Oklahoma City, Oklahoma, for defendants/appellants, Michael E. Campbell, M.D. Campbell & Associates, L.P.

**WATT, J.**

¶1 We granted certiorari to consider a single issue.[1] The first impression question presented is: whether, in a suit for breach of contract in which a party seeks compensation for an expert witness's failure to provide competent litigation support services in an underlying suit, the cause must be proven by the presentation of expert testimony.

¶2 We emphasize that this matter is grounded on a claim for breach of contract. In so doing, we also stress that this opinion does not stand for the proposition that a losing party may recover monies paid to an expert witness for the formulation and presentation of a professional opinion in the context of litigation merely because the party requesting such opinion did not prevail or recover to the extent anticipated. Nevertheless, we determine that, under the unique facts of this cause, expert testimony demonstrating that Campbell's performance in the underlying litigation was substandard was unnecessary. Campbell's own admissions were sufficient to infer negligence. Furthermore, there was additional, supporting testimony indicating that Campbell did not present an accurate document which could be empirically supported or shown to comply with governmental standards. The testimony presented was most certainly such that a lay person, through common knowledge or experience, could determine that Campbell did not produce the very thing for which the Ellisons' contracted, a supportable expert opinion concerning the state of the groundwater underlying the Ellisons' property and the source of its pollution.[2] Finally, Campbell's contradictory statements made at the time of his deposition and at trial were suffi-

---

1. On appeal, Campbell made a number of additional arguments left unaddressed by the Court of Civil Appeals. Our resolution of the cause is dispositive of all issues related to allowing testimony of individuals Campbell categorizes as "non-experts" or involving alleged deficiencies in evidence because the plaintiffs did not present a scientific expert. Objections regarding Campbell's being allowed to either discover information from the resolution, dismissal, or settlement of the Canadian County suit or to allow presentation of the same during trial are unconvincing. When those events occurred, Campbell was no longer associated with the Ellisons or the Canadian County action. At the hearing on the motion for new trial, Campbell argued that the jury should have been informed "that the case was resolved on the [Ellison's] own terms." Transcript of Motion for New Trial, April 29, 2010, at pp. 5–6. As we have emphasized, the only issue in this cause is whether Campbell breached his contract with the Ellisons in the preparation of the report intended to be utilized in the underlying litigation. How the underlying tort claim was ultimately resolved has little or nothing to do with whether Campbell fulfilled his contractual obligations. No clear abuse of discretion being demonstrated in ruling on the exclusion, we leave it undisturbed. See, *Bierman v. Aramark Refreshment Servs., Inc.*, 2008 OK 29, ¶17, 198 P.3d 877; *Lerma v. Wal–Mart Stores, Inc.*, 2006 OK 84, ¶32, 148 P.3d 880; *Myers v. Missouri Pacific R.R. Co.*, 2002 OK 60, ¶34, 52 P.3d 1014. Campbell also asserted that the trial court erred in allowing Robertson, a party and counsel for plaintiffs, to both testify as a witness and advocate before the jury. In *Crussel v. Kirk*, 1995 OK 41, ¶¶11–12, 894 P.2d 1116, we made it clear that the predecessor to Rule 5.5, Rules of Professional Conduct, 5 O.S.2011, Ch. 1, App. 3–A, did not render an advocate incompetent as a witness. Rather, it invested the trial court with discretion to determine whether that advocate might testify. In *Crussel*, and here, the testifying attorney did not act as an advocate at trial, present arguments, or examine witnesses. See, Transcript of Motion for New Trial, this note supra, comments of the trial judge at p. 12 which provide in pertinent part: "... [T]he fact that Robertson was a plaintiff but she is also a lawyer, I tried to make sure that this group was separated from their lawyer, except she sat as a representative and testified.... But I have always excluded the attorney from having a direct involvement in the trial of the case. On the other hand, I have allowed that attorney to be of assistance to the attorney they subsequently hired....". Finally, Campbell's complaints about wanting to exclude a witness who was not called and any objections concerning instructions are groundless. Transcript of Motion for New Trial, this note supra, providing in pertinent part: "... THE COURT: Okay. I guess the thing about Cottingham that doesn't seem to make any sense to me, is he wasn't allowed to testify, so even if there was some issue about how they compensated for his time, he didn't testify anyway. MR. TOLSON: You do have a good point in that regard, Your Honor....". Transcript for Motion for New Trial, this note supra, providing in pertinent part at p. 7: "... THE COURT: There was some discussion in the response that some of these—you didn't object to some of these instructions on the record. MR. TOLSON: I believe—at the end, that's correct, whenever the—we had your conclusion, I didn't make those objections ...".

2. *West v. Board of County Comm'rs of Pawnee County*, see note 19, infra. See also, *Johnson v. Hillcrest Health Center, Inc.*, note 19, infra.

cient that a reasonable juror might well question his veracity.

## FACTS AND PROCEDURAL HISTORY

¶ 3 On April 29, 1999, the Ellisons filed suit in Canadian County against an oilfield waste disposal facility alleging it was responsible for polluting the groundwater on their property. The Ellisons believed that the polluted ground water explained the deaths of cattle grazing on their property and drinking from its streams. They hired Campbell, an expert hydrogeologist,[3] in January of 2001 to conduct tests and to drill monitoring wells to establish empirical data which would allow him to render a scientifically supportable expert opinion to confirm their suspicions and provide support for their suit.

¶ 4 Campbell recommended that several monitoring wells be drilled on the Ellisons' property to provide groundwater samples for pollution measurements. In an attempt to control litigation costs, the Ellisons agreed to the drilling of two monitoring wells. Samples were collected from the wells for a period of several years while a partial summary judgment in the cause was considered on appeal. At the request of the Ellisons, Campbell prepared his expert report and presented it to the defendants in the Canadian County cause in September of 2006.

¶ 5 On December 4, 2006, Campbell appeared for his deposition. The defendants grilled the expert witness over a three-day period. During that time, Campbell testified that he did not know whether certain protocols were followed in sample testing.[4] He also pointed out errors in the report he submitted to the defense prior to his deposition, including the utilization of a value of 4,000 cubic feet in a calculation when it should have been 8,000 cubic feet.[5] When asked if he thoroughly researched industry knowledge in regard to mud pits and their relationship to leakage and pollution, Campbell responded that it was "difficult to say" and that "serendipity has a lot to do with finding articles when you need them." [6]

¶ 6 At the end of the first day of his deposition testimony, Campbell was asked to verify some of his calculations and to check errors in his written report. When asked about these items the next morning, Campbell told counsel: he "was too tired" to go over his report; he was "a busy person;" he knew the report contained misplaced bars on graphs, questionable concentrations, and the only way to be certain that all the charts in his materials were not riddled with errors

3. Transcript of Proceedings, February 9, 2010, Michael D. Campbell testifying in pertinent part at p. 210:

"... Q. Mr. Campbell, what is your profession or occupation?
A. I'm a professional hydrogeologist and geologist.
Q. And hydrogeology is what?
A. The study of groundwater...."

4. Deposition of Michael D. Campbell, December 4, 2006, providing in pertinent part at p. 17:

"... Q You understand that there's a specific protocol in utilization of the Hach kit, do you not?
... THE WITNESS: Yes, there's always instructions as to how to use them, yes. Kits.
Q (By Mr. Cottingham) In regard to how the Hach kit was used at the FPC site, you don't know if that protocol was followed or not, do you?
A No...."

5. Deposition of Michael D. Campbell, December 4, 2006 providing in pertinent part at pp. 38-40:

"... Q So is the report—is the report incorrect in that respect?

A That report—this report is incorrect in two places. One, in the cover page, and the other is in the section 1—must be page 1.
Q All right.
A Secondly, I noticed, in rereading my rebuttal, that a typo occurs on page 3, one, two, three, fourth line, middle of the line it says 4,000 cubic feet. That 4 should have been an 8. That's a typo.
Q (By Mr. Cottingham) That fly ash—and I know the load tickets that your referring to, that—correcting the report form 4,000 to 8,000 cubic feet—what percent of that is the total cubic feet of material in the FPC site?
A Don't know....
Q Using those volumetric calculations then, what does 8,000 cubic feet of fly ash equate to in terms of percent of that volume?
A We'd have to get out that calculation and then we'd have to select which of the cases that I used and then do the division....
Q But you were still willing to rely on that in terms of your affidavit?
A Yes, because it seemed to be reasonable in a general rule of thumb...."

6. Deposition of Michael D. Campbell, December 4, 2006, providing in pertinent part at pp. 65–67.

would be to go back and look at them.[7] Initially, when asked if the monitoring wells complied with Oklahoma Water Resources Board and Environmental Protection Act standards, Campbell testified he "didn't know" because he hadn't read them and that the Environmental Protection Agency would not accept his data as reliable.[8]

¶ 7 Shortly after Campbell's deposition concluded on December 6, 2006, Campbell discontinued his assistance in the Canadian County litigation. While Campbell insists this occurred because he was fired, the Ellisons contend Campbell quit. The plaintiffs/appellees' allegation was supported by testimony presented at trial.[9]

¶ 8 The Ellisons settled the Canadian County matter in January of 2007. In July of the same year, they filed their petition in Oklahoma County in the instant cause alleging negligence, tortious breach of contract, and breach of contract for the expert witness's failure to provide them with a scientifically supportable product which could be utilized in the Canadian County suit. The Ellisons sought actual and consequential damages. Campbell moved to dismiss the cause arguing that the Ellisons had not stated a claim upon which relief could be granted and that the claim sounded in contract rather than in tort. The trial court agreed in part, finding that the Ellisons' cause should proceed as a simple breach of contract case. Campbell counterclaimed arguing that he was owed some $34,758.50 for services rendered, together with prejudgment interest, reasonable attorney's fees, and costs.

¶ 9 The jury heard testimony in the instant cause over a four-day period, February 8th through the 11th, 2010. On March 11, 2010, based on the jury's verdict in the Ellisons' favor, the trial court entered judgment for the plaintiffs/appellees in the sum of $408,748.68,[10] plus statutory interest. Campbell timely filed a motion for new trial or, in the alternative, a motion for judgment notwithstanding the verdict. Campbell argued that the Ellisons' claim for breach of contract failed because they did not present an expert in hydrogeology to counter his scientific conclusions. Unconvinced, the trial court denied the motions.

¶ 10 Campbell appealed. In an unpublished opinion, the Court of Civil Appeals reversed the trial court on September 6, 2013. It determined that the trial court committed error by failing to require the Ellisons to present an expert to refute Campbell's testimony for the purpose of establishing that his actions in the underlying cause amounted to a breach of contract.

¶ 11 On September 26, 2013, the Ellisons filed their petition for certiorari with this Court. The petition was granted on December 3, 2013. We received the record on the 9th. On January 6, 2014, a new attorney filed an entry of appearance on Campbell's behalf.

## Standard of Review

### a) Denial of new trial.

¶ 12 Upon review of a motion for a new trial where the trial judge presided at the trial, heard the testimony, observed the witnesses, and had full knowledge of the proceedings, it is well settled that our standard of review is one of abuse of discretion.[11] This Court recognizes that the original adju-

7. *Id.*, providing in pertinent part at pp. 289–291.

8. *Id.*, December 4, 2006, providing in pertinent part at pp. 322–330.

9. Transcript of proceedings, February 10, 2010, Michael J. Blaschke testifying in pertinent part:

"... Q. All right. Did there come a time after that deposition when you spoke with Mr. Campbell?
A. Yes, there was.
Q. And did he have some comment on what you should do with the case from that point forward with regards to him?

A. Well, in essence he quit and said he could not or would not help us anymore...."

10. The amount awarded was almost identical to the amount the Ellisons paid to Campbell ($312,-648.82) along with the amount they expended at his request for investigatory work ($105,663.33). [These two figures total $418,312.15.]

11. *James v. Tyson Foods, Inc.*, 2012 OK 21, ¶ 12, 292 P.3d 10; *B–Star, Inc. v. Polyone Corp.*, 2005 OK 8, ¶ 13, 114 P.3d 1082; *Head v. McCracken*, 2004 OK 84, ¶ 2, 102 P.3d 670; *Evers v. FSF Overlake Associates*, 2003 OK 53, ¶ 6, 77 P.3d 581.

dicator is in the best position to know whether substantial justice has been done.[12] The strength of the showing for error or abuse of discretion is much less when the trial court refuses to grant a new trial than when such a motion is sustained.[13]

**b) Judgment notwithstanding the verdict.**

¶ 13 In ruling on a motion for judgment notwithstanding the verdict, the trial judge considers all evidence favorable to the nonmoving party and disregards all evidence favorable to the movant. We apply the same standard on review of the trial judge's decision.[14]

**c) Jury Verdict.**

¶ 14 We must affirm a jury verdict if there is any competent evidence reasonably tending to support it, evidence which is relevant and material to the issue to be determined.[15] It is not for us to weigh the evidence. We consider all the evidence tending to support the verdict, together with every reasonable inference from it. We must affirm unless there is an entire absence of proof on a material issue.[16] A jury verdict is conclusive as to all disputed facts and all conflicting statements, where there is any competent evidence tending to support the jury verdict. Where a jury has tried a cause, it is the exclusive arbiter of the credibility of the witnesses.[17]

**d) Necessity of producing expert testimony.**

¶ 15 Expert testimony is ordinarily necessary to establish causation in professional negligence cases.[18] Nevertheless, an expert is not required if the element of damage lies within the common knowledge of lay persons.[19]

¶ 16 Campbell's admissions were sufficient to demonstrate his substandard performance in preparing expert materials in the underlying litigation. Additional testimony confirmed that Campbell did not prepare an accurate document which could be empirically supported or shown to comply with governmental standards. Campbell's contradictory statements were sufficient to cause a reasonable juror to question his veracity. Under these unique facts, it was unnecessary for the Ellisons to present an expert witness. The average, lay person could most certainly conclude that Campbell had not performed the preparations necessary to produce a viable product for the purpose of demonstrating the existence and source of groundwater pollution in the Canadian County proceedings.

¶ 17 It is uncontested that Campbell and the Ellisons had an agreement for Campbell to provide hydrogeological services to support claims of pollution in the Canadian County litigation. Although Campbell prepared a report and gave his deposition in that cause, the Ellisons contend that he breached the contract by presenting an opinion which was scientifically unsupportable and of no benefit in the underlying suit. Campbell's primary argument is that the Ellisons were required to present an expert witness to refute his testimony and to establish that he breached the terms of his contract in the Canadian County litigation. Under the unique facts presented, we disagree with the expert witness's contentions.

12. *James v. Tyson Foods, Inc.*, see note 11, supra.

13. *James v. Tyson Foods, Inc.*, see note 11, supra; *Head v. McCracken*, see note 11, supra; *Mooney v. Mooney*, 2003 OK 51, ¶ 50, 70 P.3d 872.

14. *Covel v. Rodriguez*, 2012 OK 5, ¶ 11, 272 P.3d 705; *Computer Publications, Inc. v. Welton*, 2002 OK 50, ¶ 6, 49 P.3d 732.

15. *King v. Berryhill Fire Protection Dist.*, 2013 OK 76, ¶ 5, 311 P.3d 836; *Covel v. Rodriguez*, see note 14, supra.

16. *Covel v. Rodriguez*, see note 14, supra.

17. *Florafax International, Inc. v. GTE Market Resources, Inc.*, 1997 OK 7, ¶ 3, 933 P.2d 282.

18. See, *Strubhart v. Perry Memorial Hosp.*, 1995 OK 10, ¶ 33, 903 P.2d 263; *Boxberger v. Martin*, 1976 OK 78, ¶ 14, 552 P.2d 370.

19. *West v. Board of County Comm'rs of Pawnee County*, 2011 OK 104, ¶ 20, 273 P.3d 31. See also, *Johnson v. Hillcrest Health Center, Inc.*, 2003 OK 16, ¶ 13, 70 P.3d 811.

¶ 18 The opposition in the Canadian County case took Campbell's pretrial deposition. Early on in the deposition, Campbell admitted that he did not know the reliability of some of his soil-testing results [20] and that his report contained a number of typographical errors. There was testimony that, after the deposition, Campbell admitted he would not pass a challenge at trial.[21] Again, Campbell vacillated on the stand and may have caused the jury to question his honesty concerning certain conversations that took place in the underlying cause, *i.e.*[22] Campbell admitted that he had been wrong when he initially testified that certain conversations did not take place.[23] There was also credible evidence that even before his deposition in the Canadian County matter was transcribed, Campbell quit without completing his contractual duties.[24]

¶ 19 At trial, the first witness called was Brad Gungoll (Gungoll), one of several attorneys representing the oilfield waste disposal facility in the Canadian County litigation. He testified that, in presenting an expert's report to laymen, one who had prepared a report which was attentive to detail was more likely to have credibility with the jurors than one which was riddled with typographic errors.[25] Gungoll went on to state that, in the Canadian County litigation, Campbell did not present himself as an expert "attentive to detail." The witness pointed out that: there were a number of typographical errors in the report; the expert witness was unable to back up the elements of his report; when Campbell's deposition was taken, the plaintiff's case was "basically over;" and Campbell essentially abandoned some aspects of his own report, making it impossible for the Ellisons to rehabilitate him as a credible witness.[26]

¶ 20 On cross-examination, Gungoll was asked to demonstrate where or how Campbell's report was deficient. In response, he

---

20. See notes 4–5, supra, quoting Deposition of Michael D. Campbell.

21. Transcript of proceedings, February 11, 2010, Jayne Robertson testifying in pertinent part at p. 496:

"Q. What did you say?
A. I told [Campbell] that he would be very surprised if the Judge in Canadian County would allow his testimony to be presented. He responded that he felt the same, that he didn't think he would pass a challenge either...."

22. Transcript of proceedings, February 11, 2010, Jayne Robertson testifying in pertinent part at p. 496–97:

"... Q. So anything that Mr. Campbell said in this regard about what happened after the deposition is not true; is that correct?
A. I'm saying there were many things that Mr. Campbell said that were not true.
Q. Mr. Campbell testified also that there was no such conversation with Mr. Blaschke along with what—as far as what Mr. Blaschke said in the notes that he said that nobody can read but he and his wife. Mr. Campbell testified that that conversation did not happen.
... A. But the phone records show otherwise. And I was also in the office when Mr. Blaschke was talking to him...."

23. Transcript of proceedings, February 11, 2010, Michael Campbell testifying in pertinent part at pp. 519–20:

"... Q. Mr. Campbell, yesterday I had questioned you about whether there had been a telephone call between you and Mr. Blaschke. And you at the time had told the jury that absolutely not. Was that your testimony at the time?
A. Yes, that was my testimony at the time, yes.
Q. Is you testimony still the same?
A. No. And I'd like to explain....
A. Thank you. After I testified that there was no conversation, when I got back to the table, I got to thinking that there's something not quite right there. And I remembered that in the past there was a conversation between Mr. Blaschke and I, and—but I know generally what it was about....
Q. The conversation that you did have with Mr. Blaschke, was it of the things that Mr. Blaschke said in his notes and read into the record when I was questioning him?
A. That's exactly what I was emphasizing, no, that conversation was not held. I remember it was something about Ms. Robertson being angry after the deposition about me, and just the general things of what's going to happen in the future...."

24. Transcript of proceedings, February 11, 2010, Jayne Robertson testifying in pertinent part at p. 516:

"... Q. Had Mr. Campbell already quit by the time the deposition was transcribed?
A. Shortly thereafter, yes...."

25. Transcript of Proceedings, February 8, 2010, Brad Gungoll testifying in pertinent part at p. 58.

26. *Id.*, Brad Gungoll testifying in pertinent part at pp. 58–64.

pointed out that much of the expected background data was not collected and that it would be impossible to verify test results because water could not be drawn from the monitoring wells, perhaps because they were not properly completed.[27] Most notably, Gungoll stated that, by the time Campbell's deposition concluded, the Ellisons' case "for all intents and purposes, was in serious trouble"[28] and that **there was nothing which could have been done to rehabilitate their witness.**[29]

¶ 21 At least one of the attorneys in the underlying litigation testified that Campbell had admitted to him that he could not support the data contained in his reports[30] and that the information Campbell did ultimately present "was incredible, not to be believed."[31] The same individual stated that Campbell admitted not following the protocols set by the Environmental Protection Agency or the Oklahoma Water Resources Board in drilling the monitoring wells.[32] When Campbell was called to testify, he de-

nied admitting that the wells had been "fouled up" but admitted remembering his deposition testimony essentially confirming that such was the case.[33]

¶ 22 The plaintiffs/appellees did not call an expert to testify concerning the opinions offered by Campbell as a hydrogeologist in the underlying cause. Nevertheless, the jury heard ample testimony, easily understood by any lay person, demonstrating the shortcomings in Campbell's work in the Canadian County litigation. Furthermore, Campbell's testimony, in and of itself, presents sufficient evidence from which the jury could have determined that the report he submitted was not what the Ellisons had bargained for when he was hired as an expert in the Canadian County matter. Finally, there was testimony confirming that even Campbell willingly acknowledged his own shortcomings in preparing the report for litigation purposes. Under these unique facts, it was unnecessary that the Ellisons present expert testimony by another hydrogeologist

---

27. Transcript of proceedings, February 8, 2010, Brad Gungoll testifying in pertinent part at:

p. 73: "... Q. I want to know sir, how you can sit here in front of these people and tell them what the right standards are, when you cannot even voice what it is that [Campbell] failed to do?
A. I didn't say I couldn't voice. I told you just the opposite. I said, I can't tell you chapter and verse where it is in that deposition or in that report, but I can also tell you that he didn't—he never delineated the plume, he never found background, he did a lot of the simple things to do in any pollution litigation, he never did...."
p. 85: "... Q. Do you know if Mr. Campbell met those standards in this case?
A. I don't recall that detail whether or not he actually—I know some of these wells were completed in such a way there wasn't any water in them, or where he couldn't reproduce his tests. I don't know why. I don't know if that's the way they were completed. You certainly couldn't run three measures of water out of it before you tested if you can't get any water out of it. Whether or not that was just something he had to do or not, I don't know but I know that was something I can recall specifically that was a problem...."

28. Transcript of proceedings, February 8, 2010, Brad Gungoll testifying in pertinent part at p. 86.

29. *Id.*, February 8, 2010, Brad Gungoll testifying in pertinent part at p. 90.

30. Transcript of proceedings, February 9, 2010, Michael Blaschke testifying in pertinent part at p. 189:

"... Q. Okay. And who made the determination in your mind that Mr. Campbell could not support his reports?
A. Well, collectively the three lawyers did, and then he did when he confirmed that to me...."

31. Transcript of proceedings, February 9, 2010, Michael Blaschke testifying in pertinent part at p. 192.

32. *Id.*, February 9, 2010, Michael Blaschke testifying in pertinent part at p. 209.

33. Transcript of proceedings, February 9, 2010, Michael Campbell, when confronted with his prior deposition, testifying in pertinent part:

at pp. 258: "... Q. Well, let's read that. My question, 'After you realized that Mr. Alexander had fouled up the monitoring well in Canadian County, did you go back and check his other work?
Answer: Yeah, everything ...'"
at p. 260: "... 'Question: You attempted to call [the driller] to discuss deficiencies in this well and he wouldn't respond to it?
Answer: That's correct.
Question: Did you tell him I need to talk to you about the deficiencies in this?
Answer: Yes. In this well. Yes [sic] I did....'"

to counter Campbell's conclusions in the underlying litigation. Furthermore, we determine that the trial court did not abuse its discretion in denying the request for a new trial or judgment notwithstanding the verdict.

## CONCLUSION

¶ 23 This opinion should not be read for the proposition that a losing party may recover monies paid to an expert witness for the formulation and presentation of an opinion in the context of litigation merely because the party requesting such opinion did not prevail or recover to the extent anticipated. Rather, here, we are faced with a unique set of circumstances. An individual held himself out as an expert in hydrogeology capable of preparing a scientifically supportable report in that field. He contracted with the Ellisons to prepare such a document and be available to support it with his testimony. Instead, he produced a report which was admittedly error-riddled and based upon methodologies not meeting either state or federal regulations. Simply, Campbell did not perform the services for which the Ellisons contracted and paid.

¶ 24 The cause was tried to a jury. It heard evidence competent to support its verdict. Whether we agree or disagree with the outcome is immaterial. It is not for this Court to second-guess such a verdict. Therefore, we affirm both the trial court's denial of a new trial and motion for judgment notwithstanding the verdict.

COLBERT, C.J., REIF, V.C.J., KAUGER, WATT, WINCHESTER, EDMONDSON, TAYLOR, COMBS, JJ., CONCUR.

GURICH, J., RECUSED.