2015 OK CIV APP 22

Herb J. CARNAHAN and Bettye M. Carnahan, Plaintiffs/Appellees,

v.

CHESAPEAKE OPERATING, INC., a Domestic for Profit Corporation, Defendant/Appellant.

Nos. 110,489, 110,989.

Court of Civil Appeals of Oklahoma, Division No. 1.

Oct. 28, 2014.

Certiorari Denied March 2, 2015.

754

Thomas J. McGeady, Donna L. Smith, Michael T. Torrone, Logan & Lowry, L.L.P., Vinita, OK, for Plaintiffs/Appellees.

Kenneth H. Blakley, Robert D. Edinger, Edinger & Blakley, P.C., Oklahoma City, OK, for Defendant/Appellant.

WM. C. HETHERINGTON, JR., Vice–Chief Judge.

¶ 1 Chesapeake Operating, Inc. (Chesapeake) appeals entry of a $234,000 judgment following a jury verdict in favor of Herb J. Carnahan and Bettye M. Carnahan (Plaintiffs) in their lawsuit alleging trespass, public nuisance, and private nuisance arising from contamination of their land by a condensate seep from a gas well. Chesapeake claims improper jury instruction and admission of expert opinions over its objections based on *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), resulted in a lack evidentiary support for the judgment, requiring reversal. Following a review of the experience and education of the challenged experts' qualifications under relevant factors described in *Daubert,* we determine the trial court did not abuse its wide discretion in

admitting the experts' testimony into evidence and there is no reversible error in the jury instructions. The judgment entered on the jury's verdict is AFFIRMED.

## FACTS

¶ 2 Chesapeake drilled the Bettye # 1–2 Well on Plaintiffs' property in Beckham County, Oklahoma, in May of 2007, and the well subsequently began producing gas. In late December of 2007, the Oklahoma Corporation Commission (OCC) and Chesapeake began investigations based on Plaintiffs' report of odors indicating a possible leak. Chesapeake hired environmental consultants and OCC sent personnel to conduct tests at a spring and a seep on Plaintiffs' land. The testing confirmed the presence of condensate vapors. OCC's testing did not lead it to identify a source. In late December of 2009, Plaintiffs sued for public and private nuisance and trespass, alleging Chesapeake's oilfield operations had polluted and contaminated part of their ranch land and they were entitled to punitive damages.[1]

¶ 3 According to a November 23, 2011 Joint Stipulation Precluding The Presentation of Certain Evidence by Plaintiffs, Plaintiff Herb J. Carnahan, due to his ill health, was not deposed, he would not offer any testimony or exhibits at trial, and Plaintiffs' witnesses, including expert witnesses, would not rely on any statements made by him. Plaintiffs also agreed not to offer "any nonexpert testimony or evidence on the computation or amount of any damages sought by Plaintiffs."

¶ 4 A Third Amended Scheduling Order provided Plaintiffs' experts not previously deposed were "to present material relied upon and give final opinions by September 1, 2011," and Chesapeake's experts were to be deposed and give final opinions by December 1, 2011. After Plaintiffs' experts were deposed, Chesapeake filed three motions in limine, all of which raised objections under

principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), seeking to exclude Plaintiffs' three experts from testifying at trial. Chesapeake also filed a Motion for Summary Judgment As to Causation and Damages in which it argued that if the three motions in limine were granted, then Plaintiffs' claims should fail for lack of supporting evidence. In a separate Alternative Motion for Partial Summary Judgment, Chesapeake also claimed there was no evidence justifying punitive damages. In an Order filed on January 23, 2012, the trial court granted the motion for partial summary judgment regarding punitive damages and denied Chesapeake's three motions in limine and its Motion for Summary Judgment As to Causation and Damages.

¶ 5 The case proceeded to jury trial on January 31, 2012, February 1, 2012, and February 2, 2012. Plaintiffs sought over $482,000, which they contended was the remediation cost to clean up the natural gas condensate. Based upon the grounds previously cited in the denied motions in limine, Chesapeake was given a "continuing and running" objection to the opinions of Plaintiffs' experts so as to avoid disruption of the trial.[2] When Plaintiffs rested their case, Chesapeake demurred to their evidence, arguing, *inter alia*, Plaintiffs had failed to produce admissible evidence on every element of their theories for recovery and for causation, and their experts either could not identify the accepted scientific method relied upon for opinions or identified an accepted scientific method but failed to follow it. The trial court overruled the demurrer and Chesapeake presented its own evidence. After Chesapeake rested, it moved for a directed verdict, arguing Plaintiffs had produced no admissible evidence reasonably supporting their claims. Chesapeake contended Plaintiffs' experts failed to present qualified, reliable, scientific, or relevant expert opinions on

---

**1.** Allegations Chesapeake was unjustly enriched by failing to fulfill its obligations to prevent pollution were not included in a subsequent amended petition filed with leave of the trial court.

**2.** Even so, there were numerous objections raised by Chesapeake over whether Plaintiffs'

experts' live testimony violated the Third Amended Scheduling Order requiring "final opinions" in the deposition testimony and whether or not the later Pre-trial Conference Order superseded that earlier order.

causation, injury, or damages and the experts' testimony should not have been admitted at trial. After hearing argument, the trial court overruled Chesapeake's motion. The jury returned a verdict in favor of Plaintiffs and against Chesapeake in the amount of $234,000, and judgment was entered accordingly. This appeal followed.

### STANDARD OF REVIEW

¶6 "[T]he clear abuse of discretion appellate standard applies when we review a decision on the admissibility of expert testimony." *Christian v. Gray*, 2003 OK 10, ¶42, 65 P.3d 591, 608. "An abuse of discretion occurs when a decision is based on an erroneous conclusion of law or where there is no rational basis in evidence for the ruling." *Spencer v. Oklahoma Gas & Electric Company*, 2007 OK 76, ¶13, 171 P.3d 890, 895 (Emphasis omitted).

¶7 "[T]he sufficiency of the evidence to sustain a judgment in an action of legal cognizance is determined by an appellate court in light of the evidence tending to support it, together with every reasonable inference deducible therefrom, rejecting all evidence adduced by the adverse party which conflicts with it. *Park v. Security Bank and Trust Company*, [1973 OK 72, ¶21], 512 P.2d 113, 118 (Okla.1973)." *Florafax International, Inc. v. GTE Market Resources, Inc.*, 1997 OK 7, ¶3, 933 P.2d 282, 287.

¶8 "We must affirm a jury verdict if there is any competent evidence reasonably tending to support it, evidence which is relevant and material to the issue to be determined." *Ellison v. Campbell*, 2014 OK 15, ¶14, 326 P.3d 68, 73. (Emphasis and footnotes omitted.) "A jury verdict is conclusive as to all disputed facts and all conflicting statements, where there is any competent evidence tending to support the jury verdict. Where a jury has tried a cause, it is the exclusive arbiter of the credibility of the witnesses." *Id.* (Footnotes omitted.)

¶9 "We review assigned errors in jury instructions to consider whether the instructions in their entirety accurately reflect the law and whether it is reasonably evident that the jury was mislead by an erroneous instruction." *Gilbert v. Security Finance Corporation of Oklahoma, Inc.*, 2006 OK 58, ¶2, 152 P.3d 165, 171. (Footnote omitted.) "We inquire on review whether the instructions reflect the Oklahoma law on the relevant issue, not whether the instructions were perfect." *Myers v. Missouri Pacific Railroad Company*, 2002 OK 60, ¶29, 52 P.3d 1014, 1029. (Footnote omitted.) "The test of reversible error in giving jury instructions is whether the jury was misled to the extent of rendering a different verdict than it would have rendered if the errors alleged had not occurred. *Johnson v. Ford Motor Co.*, 2002 OK 24 ¶14, 45 P.3d 86, 92–93." *Covel v. Rodriguez*, 2012 OK 5, ¶26, 272 P.3d 705, 716.

### THE APPEAL

¶10 Summarized, Chesapeake's appeal raises two main issues for consideration. Chesapeake argues Plaintiffs' expert's evidence was improperly admitted, causing a failure of competent and sufficient evidence of causation, injury or damages, and the jury was not properly instructed about damages. We address these contentions in turn.

### Expert Testimony and Daubert

¶11 Chesapeake argues the evidence provided by Plaintiffs' three experts, petroleum engineer Earl Gary Keen (Keen), environmental consultant Jerry James Black (Black), and real estate appraiser Jim R. Artman (Artman), was incompetent, insufficient, and inadmissible under the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). As a result, Chesapeake contends, the trial court abused its discretion by admitting the experts' opinions into evidence, Plaintiffs did not meet their burden of proof, and a directed verdict should have been entered.

¶12 Factors to consider when assessing the admissibility of expert testimony are set forth in cases such as *Daubert* and *Kumho Tire Co., Ltd. v. Patrick Carmichael et al.*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), both of which were explicitly adopted for application in Oklahoma civil actions in

*Christian v. Gray,* 2003 OK 10, ¶ 14, 65 P.3d 591, 600.

¶ 13 The *Kumho* court held *Daubert's* general holding setting forth the trial judge's general "gatekeeping" obligation "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge" and cautions *Daubert's* "list of specific factors neither necessarily nor exclusively applies to all experts or in every case." 526 U.S. at 141, 119 S.Ct. at 1171. The *Kumho* Court notes, 526 U.S. at 142, 119 S.Ct. at 1171, how

> [T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination. *See General Electric Co. v. Joiner,* 522 U.S. 136, 143, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (courts of appeal are to apply "abuse of discretion" standard when reviewing district court's reliability determination.)

(Emphasis in original.)

The objective of the gatekeeping requirement "is to insure the reliability and relevancy of expert testimony." *Kumho,* 526 U.S. at 152, 119 S.Ct. at 1176.

■ ¶ 14 In *Worsham v. Nix,* 2006 OK 67, ¶ 35, 145 P.3d 1055, 1067, the Court lists the four factors set out in *Gray* as:

> 1. Can the theory or technique be, or has it been, tested; 2. Has the theory or technique been subjected to peer review and publication; 3. Is there a "known or potential rate of error ... and the existence and maintenance of standards controlling the technique's operation;" and 4. Is there widespread acceptance of the theory or technique within the relevant scientific community.
>
> *Id., [Gray],* 2003 OK 10, ¶ 8, 65 P.3d at 597–598, citing and quoting *Daubert,* 509 U.S. at 593–594, 113 S.Ct. 2786.

"In *Gray,* of course, we made it clear that the *Daubert* factors were intended to be flexible and were not intended to be a rigid standard applicable to every case." *Id.,* ¶ 36, 145 P.3d at 1067. Whether particular *Daubert* factors are, or are not reasonable measures of reliability in a particular case is a matter about which the law grants a trial judge broad latitude to determine, and "a trial judge must make a determination of the appropriate factors of reliability based upon the nature of the controversy before it." *Frasier, Frasier & Hickman, L.L.P. v. Flynn,* 2005 OK CIV APP 33, ¶ 23, 114 P.3d 1095, 1102 (Approved for Publication by the Supreme Court).

■ ¶ 15 As the Court teaches in *Gray,* "a *Daubert* challenge includes an initial determination of whether the expert's method is one where reliability may be taken for granted," 2003 OK 10, ¶ 11, 65 P.3d at 600, but, as stated by the U.S. Supreme Court in *Kumho,* "when the evidence is **not novel** a trial court may make that determination and avoid a prolonged *Daubert* inquiry." 2003 OK 10, ¶ 11, 65 P.3d at 599. (Emphasis in original.) Citing *Kumho,* 526 U.S. at 153, 119 S.Ct. at 1167, the Court in *Gray* noted the trial court must exercise its gatekeeping function to assure the reliability and relevance of an expert's testimony "whether relying on 'professional studies *or personal experience,*'" and to assure the expert employs "'the same level of intellectual rigor' the expert would use outside the courtroom when working in the relevant discipline." *Id.,* ¶ 13, 65 P.3d at 600. (Emphasis added.)

¶ 16 The *Worsham* Court further explains, 2006 OK 67, ¶ 37, 145 P.3d at 1068:

> Thus, *Gray* makes clear that in all cases where the reliability of an expert's testimony is sufficiently challenged, the trial court, in its gatekeeping role, must make a determination as to whether such evidence has sufficient indicia of reliability to be admitted for jury consideration, although the four *Daubert* factors may or may not be pertinent depending upon the nature of the issue at hand, the expert's particular expertise, and the subject of his testimony. We made it clear, however, that a trial court has a responsibility to insure that an expert's opinion on causation is something more than *ipse dixit, i.e.,* "a bare assertion resting on the authority of an individual." *See Gray,* 2003 OK 10, ¶ 36 and n. 19, 65 P.3d at 607 and n. 19, quoting *Black's Law Dictionary,* 961 (4th ed.1951).

At the time of trial in July of 2012, 12 O.S.2011 § 2702, the controlling statute on the central evidentiary issue, provided: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise" and 12 O.S.2011 § 2703 provided [3]:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

We review the admissibility of Plaintiffs' experts' testimony with these statutes and factors in mind, along with the *Gray* Court's direction how, if sufficiently challenged, "the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" 2003 OK 10, ¶ 11, 65 P.3d at 599 (citing *Kumho*, 526 U.S. at 149, 119 S.Ct. at 1175, quoting, *Daubert*, 509 U.S. at 592, 113 S.Ct. at 2786).

### Keen

¶ 17 Chesapeake contends Keen's opinion is based on speculation, not scientific proof, and he is not qualified by knowledge, skill, experience, training or education, rendering his gas migration opinion insufficient to establish causation. Chesapeake contends Keen failed to conduct additional testing to rule out pipelines as a source of contamination, and he admitted the science governing mitigation was geology, but he was not a geologist. Plaintiffs contend Keen did consider and eliminate other sources of contamination, including pipelines. They argue Keen observed the site, checked records, and reviewed tests, including down hole pressure tests and cement bond logs for the well.

¶ 18 According to his testimony, Keen has the experience and education described hereafter. He earned bachelor and master of science degrees in petroleum engineering at the University of Missouri at Rolla. At the University of Oklahoma, he earned a master of public administration degree in management and a master of science in environmental engineering. He did work toward but did not complete a doctorate in petroleum engineering. Keen was licensed in Oklahoma as a petroleum engineer in 1979 and as a civil engineer in 1987. He is not a geologist or hydro geologist, but his job requires him "to take a lot of geology courses."

¶ 19 Keen worked in the oilfield for oil companies during summers while in college. After earning his baccalaureate, Keen worked for about seven and a half years for an oil company both in the United States and overseas in water flow operations, reservoir work, offshore oil field development, and production work and drilling as an operations engineer, which also included investigating and determining responsibility for pollution problems. After earning his masters degree

---

**3.** Effective December 9, 2013, the Legislature amended § 2702 to provide:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise, if:
> 1. The testimony is based upon sufficient facts or data;
> 2. The testimony is the product of reliable principles and methods; and
> 3. The witness has applied the principles and methods reliably to the facts of the case.

That same date, it also amended § 2703 to provide:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

he was employed by Gulf Oil Company in Oklahoma City as an enhanced recovery engineer, an engineering sub-specialty involving fluid flow through porous media and deep underground pressures. When he enrolled in the Ph.D. program at the University of Oklahoma he was hired to teach a Blowout Prevention School in a program run by the School of Petroleum Engineering and the College of Continuing Education. He then ran his own oil control schools and gave classes at large and small oil companies. In the mid–1980s, when the oil business slowed, he quit petroleum engineering and began to work as a consultant on a contract basis, drafting city ordinances regulating drilling production for the City of Oklahoma City for about five years, for about ten years for the City of Edmond, and for about twenty years for the City of Choctaw, ending in 2004. Since 1992, Keen principally has worked as a civil engineer addressing drainage, parking lots, detention ponds, water mains, sewer mains, and building foundations. As a civil engineer he works with surface drainage, models of streams, and runoff calculations.

¶ 20 Keen also testified to his personal knowledge of the site gained after he was retained by Plaintiffs as an expert to investigate the source of contamination and to the methodology he used to reach his conclusions. He testified he applied his knowledge as a petroleum reservoir engineer and used Darcy's Law, which he testified applies to any fluid. However, he did not calculate any groundwater flow rates using Darcy's Law. He did not personally measure down hole pressures but noted Chesapeake itself did that measurement.

¶ 21 Keen considered possible sources of contamination including the Bettye # 1–2 Well, other wells, pipelines, surface spills, and leaks from pits during drilling. He ruled out illegal dumping, checked records, eliminated other well sources, and checked for but found no documentation for onsite spills. Pits had been dug at the well and steel tanks had been put on liners in the pits, so he could not "totally rule that out" as an on-site spill location. Keen discovered other pipelines, except for a Chesapeake line built in 2007, are downstream from the seep. The Chesapeake pipeline and an Atlas pipeline were pressure tested and had holes dug next to them, with negative results as to leaks. The Atlas pipeline was closed after the pressure test and when it was blown down, it did not contain any liquids, only dry gas. He also went to the site and observed the seep. Keen saw a thin layer of hydrocarbon sheen, a "rainbow," on water in the creek. He testified cement bond logs indicated both good areas and questionable areas where the cement could be porous or have tiny cracks. Keen testified the cement higher than 12,500 feet from the surface is of questionable quality. He opined the pressure test on the Betty # 1–2 Well was inconclusive on whether there was a small fracture in the well's surface casing or wear on the surface casing due to the drill string turning, the rig being out of vertical plumb, a slightly bent kelly, or a crooked hole in the surface casing hole. Keen advised the well also could have a natural fracture or have had one induced by pressures outside the surface casing back to the surface of the ground. Keen testified the mud log showed several zones of gas production above the area of good cement and these areas were insufficient for commercial production. He opined gas from one of these zones entered the well's annulus (the area between the production casing and the wall of the hole) and then migrated toward the surface. He did not have a theory that the rock was fractured before gas came into the well's annulus. Keen noted OCC hydrologist Shawn Coslett had earlier testified how, despite that a gauge indicated zero pressure, after a valve from the surface casing to a frac tank was opened, there was a loud noise from escaping gas and gas had flowed for several minutes.

¶ 22 Keen searched for a pipeline owned by Aquila Southwest Pipeline and was informed by Plaintiff Bettye Carnahan and OCC hydrologist Shawn Coslett[4] that nei-

---

4. The jury heard testimony from Coslett just prior to that of Keen. Coslett testified he had used a pipeline locator device to detect pipelines buried roughly 10 feet deep or less and did so on three occasions, as had Chesapeake employees, but no pipeline was located. Coslett also testified the map showing an Aquila pipeline was inaccurate in several other respects, including the omission

ther could find an easement for such a pipeline and no surface markers or signs indicate its presence near the area in controversy. He concluded this pipeline did not exist near the contaminated area.[5] From this process of elimination, Keen was "back to the source of contamination being associated with this Bettye Well." In his opinion the contamination flow did not move through virgin rock, it had traveled up the wellbore until it reached the surface and then exited the wellbore. He testified this opinion was based on principles petroleum engineers use daily, not peer reviewed scientific methodologies. He described the area contaminated as "not a huge leak."

¶ 23 Applying the *Daubert* principles, Keen's education, experience, and methods do not render his opinion unreliable and therefore inadmissible. Based on the foregoing considerations, the trial court did not abuse its discretion when determining Keen's testimony was admissible.

### Black

¶ 24 Black attended the University of Oklahoma, earned a bachelor of science in zoology and a master's in environmental science from the College of Engineering. Following graduation, he worked from 1980 to 1984 at the Oklahoma Water Resource Board as an enforcement officer, looking at complaints and conducting inspections of fish kills and laboratories. In 1984 and 1985, he managed a lab certification program and sent samples of unknown materials out to contract laboratories seeking certification. In "1984–and–a–half, almost 1985" he transferred to the Research and Standards section at the Oklahoma Water Resource Board, conducting cleaning surveys, clean-lake studies, and supervising the Tar Creek remediation site. In addition, he did special enforcement activities and was responsible for knowing safe substance levels for water for drinking or contact and statutory standards for some pollutants, and for maintaining and assuring the integrity of tests. He worked on pro-

jects setting up toxicity testing standardized procedures. In 1985, he started his own environmental consulting company, providing consulting services to companies needing help to come into compliance with state and federal laws, and monitoring sites, including Resource and Recovery Act sites and hazardous sites. He testified he has been qualified to testify concerning environmental remediation, chemical fingerprinting, and gas chromatography analysis in state and federal district courts.

¶ 25 Black was retained by Plaintiffs to look at the seepage, take samples, find the extent of pollution, become familiar with the area as it related to the seepage, and develop a remediation plan. He examined gas chromatography analysis generated by the Oklahoma Corporation Commission and Chesapeake. He reviewed OCC files before a site visit in April of 2010. He examined the spring and took samples of it. He walked the ravine containing the spring to a fence line. He did some boring 40 yards above the spring and encountered ground water polluted with condensate. Black took samples of sediments at different levels during the boring and of water found beneath the surface. He could smell oil on the spring and saw visual sheens on the water. The odor was strong, and he had to back out "every now and then" to get some fresh air. Black was on site for about seven hours during this site visit. He visited the site a total of five times, several times when Chesapeake experts also were on site.

¶ 26 At his business, Black keeps a running list of the rental cost of different types of equipment used for cleanups. For Plaintiffs' site he proposed cleaning it by constructing approximately 468 feet of trench; installing monitoring wells; doing two high pressure washes of the spring area; collecting the wash products and water with booms and pads; removing contaminated sediments; removing contaminated dirt; disposing of the contaminated dirt, wash water, and wash materials; testing; and restoring the area by removing the trench. Compared to the Tar

---

of two wells and the inclusion of a well that did not exist.

5. The jury later heard Plaintiff Bettye Carnahan testify how, in 1992, Aquila was denied permission to locate a pipeline in the subject area and had constructed it in another section.

Creek remediation, he characterized this project was "very small." The subtotal cost just for the stream irrigation/washing is "almost $100,000." He calculated the total cost of the equipment, disposal, and materials was $482,390.63.

¶ 27 Applying the *Daubert* factors, Black's education, experience, and methods do not render his testimony inadmissible due to being unreliable. The trial court did not abuse its discretion when determining Black's testimony was admissible.

### Artman

¶ 28 Artman testified he has been a real estate appraiser for 39 years, and he is the owner of a real estate appraisal company. Prior to forming his company, he was employed during the 1970s by Sooner Federal Savings and Loan and Oklahoma Appraisal Company. His appraisal work is not confined to a certain area of Oklahoma and he has previously appraised property in Beckham County.

¶ 29 Artman has a bachelor of administration in mathematics and has completed 21 hours toward an MBA degree. Starting in the 1970s, he took "numerous" courses in appraisal, mostly in working towards a Member Appraisal Institute designation, and courses, including continuing education, for State of Oklahoma certification. He has attended a seminar given by the Appraisal Institute on different factors to consider when analyzing contaminated property. Artman is a member of Real Estate Appraisal Data, Inc., an appraisal group in the Oklahoma City area, and is one of 45 appraisers appointed to the Standards and Disciplinary Procedures Committee for the Oklahoma Real Estate Appraisal Board. As a member of that committee he serves on three-member panels hearing grievances to determine if there is a violation of the Uniform Standards of Professional Appraisal Practice and to recommend discipline, fines, or penalties. Artman is a one of 389 Certified General Appraisers in Oklahoma and is qualified to appraise all types of properties.

¶ 30 Artman has performed 15 appraisals for diminution in value resulting from contamination and, in the past five years, has prepared this type of appraisal for lawsuits. He has appeared as an expert witness in the federal district court in Oklahoma City and multiple state district courts.

¶ 31 Artman testified Advisory Opinion No. 9 defines diminution in value as the difference between the unimpaired and impaired values of the appraised property due to increased risks or costs attributable to the property's environmental condition. Artman first determined the property's highest and best use by applying tests of what uses are physically possible, legally permissible, and financially feasible to ascertain the maximally productive use. He concluded the highest and best use of Plaintiffs' property was agricultural, *i.e.*, for cultivation or ranching. He looked at eight comparable sales to value the land, four of which were most comparable, and other comparable sales for the residence on the land. He opined the unimpaired value of the land was $800 per acre and the residence's value was $65,000. He walked the area of contamination and observed a sheen of oil residue along the creek bed and dead trees and vegetation. Artman walked the perimeter of the property to "get an idea of the lay of the land" and reviewed Beckham County soil surveys, assessor records, and deeds. He learned the property was issued an organic farming certificate by the Oklahoma Department of Agriculture, Food, and Forestry in 2003. Artman testified he did not know the full extent of contamination or the chemicals involved, and he obtained the cost of remediation from Black. He testified appraisers do not typically have scientific or technical expertise and they routinely rely on experts with a background in remediation. Artman has worked with Black on six or seven similar occasions and considers Black reliable. He allowed that if Black's clean-up costs were changed, his own diminution in value appraisal would also change.

¶ 32 Artman described three effects or factors to look at to assess impaired value: (1) cost effect, such as deductions for remediation costs, (2) use effects, such as limitations or restrictions on use, and (3) risk effect, such as environmental risk or uncertainty or market stigma perceptions. He testified that

Advisory Opinion No. 9 permits an appraiser to determine a diminution in value based solely on the costs of remediation. Using the edition of Advisory Opinion No. 9 in effect on December 27, 2007, the date of his appraisal, Artman concluded Plaintiff's 611 acre property had an unimpaired value of $554,000 ($800 per acre plus $65,000 for the house) and, using the cost effect factor, a diminution in value of $483,431 to the property as a whole if not cleaned up. He attributed the diminution to the property as a whole because it was one contiguous ranch. Artman concluded a willing buyer would not pay more than $70,659 for the property with the on site contamination in place due to the cost of cleanup.[6]

¶ 33 Chesapeake claims only OCC may require remediation and, as a consequence, Artman's appraisal is flawed. We reject this claim because Plaintiffs seek damages, not remediation itself. As to jurisdictional powers of OCC and of the district courts, the Court, in *Meinders v. Johnson*, 2006 OK CIV APP 35, ¶ 27, 134 P.3d 858, 866, explains:

> Clearly, and in keeping with the limited jurisdiction of the Corporation Commission, the Oklahoma Supreme Court has recognized that the district courts of this state possess the authority to determine private rights'[sic] disputes arising from mineral production. *Tenneco Oil Co. [v. El Paso Natural Gas Company]*, 1984 OK 52, ¶¶ 20–23, 687 P.2d [1049] at 1053–54. Indeed, there seems little doubt that only the district courts of this state possess jurisdiction to award nuisance or negligence damages for pollution and cleanup. *Union Texas Petroleum Corp. v. Jackson*, 1995 OK CIV APP 63, 909 P.2d 131; *Tenneco Oil Co. v. Allen*, 1973 OK 129, 515 P.2d 1391; *Sheridan Oil Co. v. Wall*, 1940 OK 225 [187 Okla. 398], 103 P.2d 507. See also, *Marshall v. El Paso Natural Gas Co.*, 874 F.2d 1373 (10th Cir.(Okl.) 1989); *Greyhound Leasing & Financial Corporation v. Joiner City Unit*, 444 F.2d 439 (10th Cir.(Okl.) 1971). And, it appears that a party may pursue a damages claim in district court concurrently with a remediation action before the Corporation Commission. *Schneberger v. Apache Corp.*, 1994 OK 117, 890 P.2d 847; *Union Texas Petroleum Corp.*, 1995 OK CIV APP 63, ¶ 19, 909 P.2d at 139. Further, a successor operator may be held liable for maintaining a pollution-related nuisance created by a predecessor. *Union Texas Petroleum Corp.*, 1995 OK CIV APP 63, ¶ 26, 909 P.2d at 141.

We reject Chesapeake's OCC argument as a basis for reversal.

¶ 34 Applying the *Daubert* principles, Artman's opinion is based upon common and customary measures used by appraisers applying relevant industry guides, and he does not lack sufficient and relevant experience and education to form his conclusions. The trial court did not abuse its discretion by denying Chesapeake's request to bar Artman from testifying.

¶ 35 The question of the weight to be accorded the testimony of the challenged experts was for the trier of fact and will not be re-weighed on appeal under the guise of evaluating admissibility. The trial court has not been shown to have abused its discretion in allowing admission of the challenged testimony and reversal on the basis of inadmissibility is rejected.

*Instructions*

¶ 36 Chesapeake contends the jury was misled into awarding unreasonable damages by improper jury instructions. Chesapeake contends it "objected that the instructions failed to inform the jury of [its] theory of what constituted *required* and *reasonable* remediation." (Emphasis in original.) Chesapeake contends it unsuccessfully offered instruction requiring the jury to consider the reasonable remediation costs "in accordance with the laws, policies, rules, and regulations" of the State of Oklahoma and the

---

6. Chesapeake introduced evidence of successful sales of previously polluted properties, all of which sales occurred after remediation of the pollution. Such market information is relevant when using the market stigma factor of Advisory Opinion No. 9 to assess damages, but not on point when addressing the value of property using the factor assessing damages based on the cost of remediation. Artman's damage analysis was premised on cost of remediation, not on market stigma. Which factor to use in this case presented a fact question for the jury.

OCC, how OCC has "exclusive jurisdiction over site remediation," and that OCC would determine whether remediation was required and what level of cleanup was needed. The trial court also rejected Chesapeake's proposed instruction limiting damages to a restricted portion of Plaintiffs' property.

¶ 37 "The test on review of instructions given or refused is whether there is a probability the jury was misled to the prejudice of the complaining party, *Wilkerson Motor Co., Inc. v. Johnson,* [1978 OK 12], 580 P.2d 505 (Okla.1978), or a proper issue was excluded from the jury's consideration. *Woodall v. Chandler Material Co.,* [1986 OK 4], 716 P.2d 652 (Okla.1986)." *Rogers v. Welltech, Inc.,* 1991 OK CIV APP 21, ¶ 8, 813 P.2d 534, 536.

¶ 38 The jury was instructed not to use speculation or guesswork and that their "decision must be based on probabilities, not possibilities." They were cautioned against double recovery both as to temporary and permanent damages and as to Plaintiffs' three theories of liability-trespass, public nuisance, and private nuisance.[7] They were instructed how permanent damage was the difference between "the reasonable market value of the affected property" immediately before and after injury and temporary damage was "the cost of restoring the affected property to its former condition," with compensation for loss of its use, and how the cost of restoration "cannot exceed the depreciated value of the affected property itself." They were instructed to decide if remediation was needed, and if it was not that no damages should be awarded, but if remediation was needed, then they should determine an amount of damages to be awarded Plaintiffs. The jury was instructed a damage award based on remediation "may not exceed the difference between the 'fair market value' as the term is used in these instructions of the affected property" before and immediately after "the hydrocarbons were discovered" and to determine damages based on the evidence using a three step process:

> *First Step:* The dollar amount which represents a) the fair market value of the affected property immediately before the hydrocarbons were discovered; and b) the dollar amount which represents its fair market value immediately after the hydrocarbons were discovered.

> *Second Step:* The dollar amount which represents the difference between a) and b) in the **First Step** is the "diminution in the value" of the affected property, and the damages may never exceed this amount.

> *Third Step:* The dollar amount which you have determined is the reasonable cost of remediating the affected property.

(Emphasis in original.)

Chesapeake contends the jury was "left to conjecture about the proper damages" and about what area was the "affected property." Chesapeake argues the jury should have received its "clarification" instruction advising that Plaintiffs had only presented evidence that three acres of their property were affected. The record does not support this contention, which conflates the question of the physical area affected by pollution with the question of damages for impairment in value. At one point during Black's testimony, Chesapeake's counsel asked if it would be "a fair estimate to say" the area affected by pollution was three acres or less, to which Black answered he had not done that calculation. Chesapeake presented its *own* evidence concluding any damages were limited to a small area. In contrast, Plaintiffs presented evidence of impairment to the value of the whole property if the seep were not cleaned up.

¶ 39 Chesapeake contends the jury should have received its proposed instructions regarding OCC exclusive jurisdiction over site remediation, the cost for remediation under OCC policies, rules, and regulations, and that "the OCC would determine whether a remediation was required and cleanup levels to be achieved." As noted above, Plaintiffs sought damages, not an order for site remediation. The refusal of the instruction does not present reversible error.

---

7. These theories and their "essential elements" were defined in Instructions No. 12, 13, 14, 15, 17, and 18. Instruction 16 defined "direct cause."

¶ 40 The weight and credibility to be ascribed to the competing views on the area of Plaintiffs' property suffering an impairment in value was a question for the jury. Having considered the instructions given, the evidence, the issues raised and the instruction requested, we conclude the instructions given substantially covered the issues and the applicable law was adequately and fairly explained to the jury. Further, nothing in the record indicates the jury itself was confused on the issues. We conclude there was no prejudicial misstatement of law and no fundamental error in the instructions and the omission of the requested instructions do not constitute reversible error under the record presented. The judgment will not be disturbed due to the instructions.

## CONCLUSION

¶ 41 "It is not for us to weigh the evidence. We consider all the evidence tending to support the verdict, together with every reasonable inference from it. We must affirm unless there is an entire absence of proof on a material issue." *Ellison v. Campbell,* 2014 OK 15, ¶ 13, 326 P.3d 68, 73. (Footnote and emphasis omitted.) The trial court did not abuse its discretion by determining the testimony of the three experts challenged by Chesapeake was admissible. Further, no reversible error is shown as to the jury instructions given and refused. The judgment entered on the jury's general verdict in favor of Plaintiffs and setting damages at $234,000 is **AFFIRMED.**

¶ 42 In a separate section of their answer brief, Plaintiffs request appeal related attorney fees and costs. However, the Oklahoma Supreme Court has revised the applicable rule on appellate attorney fees. Okla.Sup.Ct.R. 1.14(B) provides: "A motion for an appeal related attorney's fee must be made by a separately filed and labeled motion in the appellate court prior to issuance of mandate." Plaintiffs' request for appeal related attorney's fee is **denied** without prejudice to refiling pursuant to Okla.Sup.Ct.R. 1.14.

JOPLIN, P.J., concurs, and BUETTNER, J., concurs in result.